## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

RUGH A. MASON and SHERRY L. MASON, )
husband and wife, )
               Plaintiffs, )
  )
    vs )      Civil Action No. 12-369
  )      Judge Conti
RANGE RESOURCES-APPALACHIA, LLC and )      Magistrate Judge Mitchell
NISOURCE ENERGY VENTURES, LLC, )
               Defendants. )

## REPORT AND RECOMMENDATION

I.    <u>Recommendation</u>

It is respectfully recommended that the motion for partial summary judgment filed on

behalf of the plaintiffs, Rugh A. Mason and Sherry L. Mason (ECF No. 53), be denied. It is

further recommended that the motion in limine filed by the plaintiffs (ECF No. 55) be dismissed.

It is further recommended that the joint motion to strike plaintiffs' motion for partial summary

judgment, filed on behalf of the defendants, Range Resources-Appalachia, LLC and NiSource

Energy Ventures, LLC (ECF No. 58), be denied.

II.    <u>Report</u>

Plaintiffs, Rugh A. Mason and his wife, Sherry L. Mason, bring this action against

Defendants, Range Resources-Appalachia, LLC ("Range Resources") and NiSource Energy

Ventures, LLC ("NEVCO") arising out of the attempts by Defendants to obtain production rights

for the natural gas located under their land. Specifically, Plaintiffs seek a declaration that they

(and not the Defendants) own all drilling and production rights to the natural gas associated with

their land. In addition, they allege that Range Resources tortiously interfered with Rugh

Mason's relationship with his employer after he refused to amend and ratify an old gas lease or

enter into a new lease with Range Resources for gas production rights.

Presently pending before the Court are three motions. Plaintiffs have filed a pro se motion for partial summary judgment with respect to Count II, the claim for a declaratory judgment about the gas lease.[1] In addition, Plaintiffs have filed a "motion in limine." Defendants have filed a joint motion to strike the motion for partial summary judgment (as well as a response in opposition). For the reasons that follow, the motion in limine should be dismissed and the motion to strike should be denied, but on the merits, Plaintiffs' motion for partial summary judgment should also be denied.[2]

Facts[3]

On March 22, 1961, John A. Burig, Flora W. Burig, and Anna C. Burig entered into an oil and gas lease with The Manufacturers Light and Heat Company for a 165-acre tract in Washington County, Pennsylvania (the "Lease"), recorded at Washington County Recorder of Deeds Book Volume 1101, page 418. (Compl. ¶ 7 & Ex. A.)[4] John Burig and Anna Burig are deceased. (ECF No. 63 App. B.) Flora Burig cannot be located, and Defendants suggest that it can be presumed (given the fact that her husband John Burig was born in 1889) that she is deceased. (Stockman Decl. ¶ 2.)[5] Plaintiffs have succeeded to the ownership of a 151-acre portion of the land originally owned by the Burigs, and that is subject to the Lease executed by

---

[1] Plaintiffs had counsel when this case was filed and for some time thereafter. However, after an unsuccessful settlement conference on November 17, 2012, counsel filed a motion to withdraw which was granted on December 12, 2012. Since that time, Plaintiffs have proceeded pro se.

[2] Defendants have requested oral argument, but the written record provides a sufficient basis to deny Plaintiffs' motion for partial summary judgment. Further exploration of the issues is not needed at this time.

[3] These facts are taken from the Complaint and from Defendants' Statements of Material Facts in Opposition to Plaintiffs' Motion for Partial Summary Judgment (ECF No. 62), the latter of which are supported by an appendix of materials (ECF No. 63). Although the motion under consideration was filed by Plaintiffs, they did not submit a concise statement of material facts, nor have they responded to Defendants' statements. It is unlikely that they would dispute the facts, which primarily outline background events and quote provisions from the Lease.

[4] ECF No. 1-2.

[5] ECF No. 63 App. C.

the Burigs.  (Compl. ¶¶ 5, 7; J. Kramer Aff. ¶ 4.[6])

Plaintiff Sherry Mason has been an owner of the property since at least 1984, but did not object to the Lease for over twenty-five years.  <u>See</u> Deed dated October 29, 1984 from Jacqueline Walker and Robert Walker to Gilbert Roth and Sherry Z. Roth (NEV-000020-21).[7] Columbia Gas Transmission, LLC ("Columbia Gas") and NEVCO have succeeded to The Manufacturers Light and Heat Company's rights as the lessee under the Lease. (Compl. ¶¶ 9, 18 & Ex. D.)

<u>Lease Provisions</u>

The Lease grants the lessee (1) the right "to explore and drill for, produce and market all oil and gas" under the land; and (2) the right to utilize the land "for injecting, storing and withdrawing gas of any kind, regardless of the source thereof, and for protecting the gas stored therein as well as under adjoining and neighboring lands." Lease § 1.

The Lease states that it has a primary term of ten years from April 1, 1961, and:

> as long thereafter as the above described land or any portion thereof is operated by the Lessee, in search for or in production of oil and gas or as long as such land is utilized by Lessee alone or conjointly with the neighboring lands for either the storage of gas by injection, storage and removal of gas through well or wells operated on either the land herein demised or other adjoining or neighboring lands comprising a part of the same gas storage field, or for the protection of any gas stored in such storage field.  The parties hereto agree that the Lessee shall be the sole judge as to whether such land is being used for any of the aforesaid gas storage purposes, including protection of stored gas, and Lessee's determination thereof shall be final and conclusive.

Lease § 2.

In exchange for the lessee's exercise of storage and production rights, the Lease provides for: (1) a royalty payment of one-eighth of the value of oil produced from the premises; or (2) an

---

[6] ECF No. 63 App. D.
[7] ECF No. 63 App. E.

annual fixed amount per gas production or storage well; or (3) an annual rental fee of $165.00 ($1.00 per-acre). Lease § 3. The Lease provides that "Lessee shall be the sole judge as to whether to drill or not drill on said land, and the consideration and rentals paid and agreed to be paid hereunder constitute adequate compensation for such privilege." Lease § 3.B.

The Lease states that:

Lessee may continue to hold all its production and storage rights granted hereunder by continuing either to make the said acreage rental payments as provided herein or by resuming payment of such acreage rental payments on this lease in lieu of such royalty payment within three (3) months from the time Lessee has ceased to operate the last well on this lease for any of the aforesaid gas production or storage purposes.

Lease § 3.B.

Finally, the Lease contains an assignment provision, which states that:

The entire interest or estate of either party hereto or any part thereof may be assigned, and in the event this lease or any part is assigned by Lessee, the assignee of such Lease or part thereof shall thereafter be solely liable for all payments to be made to Lessor and other obligations as provided hereunder on that portion of the lease so assigned….

Lease § 6.

Defendants indicate that Plaintiffs have not alleged that their predecessors-in-interest, including John Burig, ever contested the validity of the Lease or the retention of production rights under the Lease. (Stockman Decl. ¶ 3.) Further, Plaintiffs do not contend that the lessee under the Lease has at any time failed to make any rental payment required under the Lease. (Stockman Decl. ¶ 4.) There is no evidence indicating that John Burig, Flora Burig or Anna Burig ever considered the Lease forfeited or terminated, in whole or in part, as a result of non-production. (Stockman Decl. ¶ 5.) Jeffrey Kramer, Land Manager for Range Resources who is responsible for land and lease acquisitions in Washington County, states that Plaintiffs have not demanded that Columbia or its assignees drill a well on the property. (J. Kramer Aff. ¶¶ 2, 12.)

<u>Natural Gas Storage and the Development of Dual Purpose Leases</u>

Oil and natural gas production began in western Pennsylvania in the late 1800s and was quite common in the early 1900s. (Maddox Decl. ¶¶ 11-13.)[8] Most of the gas production came from relatively shallow geological formations, containing relatively small amounts of native natural gas. As those formations became economically depleted by the 1940s and 1950s, the formations began to be utilized for gas storage. (B. Kramer Decl. ¶ 10;[9] Maddox Decl. ¶¶ 13-16.)

Gas is stored in the same naturally occurring geological formations from which gas was produced. (Maddox Decl. ¶¶ 15, 17.) Generally, wells inject gas into the storage formations during the summer months and then withdraw the gas during the winter heating season, in order to meet increased seasonal demand for gas in the winter months without the need for construction of pipelines that would remain underutilized much of the year. (Maddox Decl. ¶¶ 14-16, 18.) In the areas used for storage, the geological formations create a natural container which allows gas to be stored there without escaping, and with suitable porosity and permeability to permit easy injection and rapid withdrawal of the stored gas. (Maddox Decl. ¶ 19.)

Storage fields are very expensive to develop and maintain, and there are only a limited number of sites where the geological conditions will permit development of a storage field. (Maddox Decl. ¶¶ 19-25.) In a traditional oil and gas lease, the lessee may drill wells on the property for the purpose of extracting oil or gas, and compensation will be provided to the landowner in the form of a royalty payment (typically, one-eighth of the value of oil and gas produced from the property). (Maddox Decl. ¶ 27.) However, only a finite amount of oil or gas can be economically produced from a lease and the landowner's return will be limited by the

[8] ECF No. 63 App. F.
[9] ECF No. 63 App. G.

volume of native oil or gas that can be produced from the well.  (Maddox Decl. ¶ 27.)

As native gas was depleted in the Appalachian Basin, the amount of royalties a landowner could expect from a traditional production-only oil and gas lease would decline significantly.  (Maddox Decl. ¶ 27.)  With the introduction of storage fields, a new form of lease developed in the Appalachian Basin – a "dual purpose" lease, providing both the right to explore for and produce gas and the right to store gas.  (B. Kramer Decl. ¶ 10.)  Dual purpose leases have been reasonably common in Pennsylvania and the Appalachian Basin for the past 75 years. (B. Kramer Decl. ¶ 10.)

Dual purpose leases, which provide a rental payment when the subsurface is used for storage or for the protection of the storage reservoir, gave landowners a minimally intrusive way to earn guaranteed income from an oil and gas lease where production was not economically feasible.  (B. Kramer Decl. ¶ 10; Maddox Decl. ¶¶ 28-31.)  Therefore, dual purpose leases have become common in the Appalachian Basin, and have provided significant benefit to landowners (who obtained a steady source of income), gas companies (who were able to maintain the lease and use depleted reservoirs) and the public (because storage enabled a supply of natural gas sufficient to address seasonal fluctuations in demand for natural gas).  (B. Kramer Decl. ¶ 10.)

The Donegal Storage Field

Columbia Gas, an interstate natural gas pipeline company, owns and operates several natural gas storage fields, including the Donegal Storage Field whose boundaries encompass the property at issue.  (Maddox Decl. ¶ 4.)  The Donegal Storage Field was first activated in 1940, and consists of approximately 11,000 acres of land in Blaine, Donegal and West Finley Townships in Washington County. (Maddox Decl. ¶ 5.)  In order to create the Donegal Storage Field, Columbia Gas's predecessor, the Manufacturers Light and Heat Company, entered into

dual purpose leases with overlying landowners.  (Maddox Decl. ¶ 6.)

The storage field is critical to maintaining the natural gas supply on days of peak demand in the northeast.  (Maddox Decl. ¶¶ 4, 7.)  At all relevant times, Columbia Gas or its predecessors in interest have continuously stored gas in the Donegal Storage Field.  (Compl ¶ 9; Maddox Decl. ¶¶ 5, 10.)  Plaintiffs admit that the premises have been utilized as part of the Donegal Storage Field, for the storage of gas or for the protection of stored gas, since prior to the end of the primary term of the Lease, and that this use has continued without interruption through today. (Compl. ¶¶ 6, 9, 10, 39; J. Kramer Aff. ¶ 6.)  However, they have alleged that neither Manufacturers Light and Heat Company nor Columbia Gas has ever attempted to drill for or produce gas or oil on their property under the terms of the Lease at any time since 1961. (Compl. ¶¶ 11, 14.)

Production from Strata Beneath the Donegal Storage Field

Defendants indicate that, while it is possible to drill through storage formations to explore for gas that may be located in deeper formations, it is potentially quite dangerous.  If the integrity of the storage field were breached, it could destroy the integrity of the entire field, could potentially contaminate local aquifers, and could severely impact the public's natural gas supply. (Maddox Decl. ¶¶ 32, 34-35, 37-40, 42-44.)  Moreover, a sudden and uncontrolled escape of gas from the field could cause significant property damage and physical harm to members of the drilling rig and those in the surrounding area.  (Maddox Decl. ¶¶ 34, 37.)

The Commonwealth of Pennsylvania has recognized these risks and has created regulations for drilling through storage fields. 25 Pa. Code §§ 78.76 et seq. (Maddox Decl. ¶¶ 36, 41-42.)  Columbia Gas has fashioned its own standards for drilling through its storage fields, which it asserts are often more detailed than state regulations. (Maddox Decl. ¶ 36.)

It only recently has become technologically and economically feasible for the safe exploration for and production of gas from deeper formations by drilling through a gas storage field. (Maddox Decl. ¶¶ 33, 45-50.) A reasonably prudent operator would consider whether drilling through the storage field would endanger the driller or the integrity of the storage field. (Maddox Decl. ¶¶ 47, 50.)

<u>Recent Developments</u>

On December 27, 2005, Columbia Gas entered into a sublease with Range Resources (then known as Great Lakes Energy Partners, LLC) for whatever gas development and production rights it had in the Donegal Storage Field (except for the sandstone gas storage formation), including any rights that might have continued to exist under the 1961 Lease. (Compl. ¶ 13 & Ex. B; J. Kramer Aff. ¶ 7.)

On March 23, 2007, Range Resources (still known as Great Lakes) entered into a new oil and gas lease with the Masons under which Range Resources leased from the Masons the oil and gas under their land for the purposes of drilling, operating for, producing, removing and marketing oil, gas and coalbed methane gas for a period of three years. However, Range Resources did not perform any oil or gas drilling or production activity on the Masons' land during the term of this sublease, which by its terms expired in March 2010. (Compl. ¶¶ 16-17 & Ex. C.) Range Resources admits that it entered into this lease and that it terminated after expiration of its primary term in March 2010. (Range Resources Answer ¶¶ 16-17.)[10]

On December 9, 2009, Columbia Gas assigned to NEVCO all of its right, title and interest as sublessor under the Range Resources 2005 sublease. (Compl. ¶ 18 & Ex. D; J. Kramer Aff. ¶ 8.) In April, 2010, NEVCO sublet to Range Resources the production rights, if

---

[10] ECF No. 24.

any, possessed by NEVCO for all formations below the top of the Rhinestreet formation in the Donegal Storage Field pursuant to the gas storage leases, including the 1961 Lease.[11]  Plaintiffs allege that, since 1961, no entity has engaged in any oil or gas drilling or production activity on their land, nor has any entity paid them any consideration for any oil and gas production rights that could still exist under the 1961 Lease.  (Compl. ¶¶ 20-21.)  They further allege that, except for the delay rental paid under the 2007 lease (which expired in March 2010), neither Great Lakes nor Range Resources has paid any royalties or other consideration for their oil and gas rights.  (Compl. ¶ 22.)  Range Resources denies these allegations.  (ECF No. 24 ¶¶ 20-22.)

From time to time Range Resources has asked the Masons either to amend and ratify the 1961 Lease or to re-lease their land to Range Resources, but the Masons have refused.  In 2011, Rugh Mason also told other landowners in the Donegal Storage Field that the old gas storage leases in his view did not hold the production rights and he urged other landowners not to enter into the lease modifications sought by Range Resources.  He stated that the landowners could likely obtain betters terms for the gas production rights.  (Compl. ¶¶ 24-25.)

Range Resources states that, pursuant to its subleases, it has begun exploration and drilling operations and has continuously operated within the Donegal Storage Field.  It applied for a drilling permit for its first well on August 14, 2007.  (J. Kramer Aff. ¶¶ 7-9; Maddox Decl. ¶¶ 8-10.)  To date, Range Resources has drilled or commenced the drilling of 69 wells utilizing acreage subject to the sublease, the first of which was completed on February 4, 2008.  (J. Kramer Aff. ¶ 10.)  As of January 7, 2014, Range Resources has placed into production approximately 53 of the wells it has drilled in the area of the Donegal Storage Field.  (J. Kramer

---

[11] The Complaint alleges that the sublease was dated April 13, 2010 (Compl. ¶ 19).  Range Resources gives the date of the sublease as April 9, 2010 in its answer (ECF No. 24 ¶ 19).  Jeffrey Kramer's affidavit gives the date as April 1, 2010 (J. Kramer Aff. ¶ 9).  The 2010 sublease has not been placed into the record by any party.

Aff. ¶ 11.)

Procedural History

On February 27, 2012, Plaintiffs filed a complaint in the Court of Common Pleas of Washington County, Pennsylvania.  Count I alleges that Range Resources tortiously interfered with Rugh Mason's relationship with his employer after he refused to amend and ratify the 1961 Lease or to lease new gas production rights to Range Resources.  Count II seeks a declaration that Plaintiffs own all drilling and production rights to the natural gas associated with their land and that no such rights are possessed by Range Resources or NEVCO.

On March 26, 2012, Defendants filed a notice of removal, asserting jurisdiction based on diversity of citizenship in that Plaintiffs are Pennsylvania citizens; Range Resources is a limited liability company whose members are Range Resources-Pine Mountain, Inc. and Range Production Co., both Delaware corporations with a principal place of business in Fort Worth, Texas; NEVCO is a Delaware limited liability company whose sole member is Columbia Energy Group, a Delaware corporation with a principal place of business in Columbus, Ohio; and the amount in controversy, excluding interest and costs, exceeds the sum of $75,000.00  (Notice of Removal ¶¶ 10-21 & Exs. C, D, E.)

On December 23, 2013, Plaintiffs filed a motion for partial summary judgment (ECF No. 53) and a "motion in limine" (ECF No. 55).  Defendants filed their opposition on January 13, 2014 (ECF No. 61), along with a concise statement of material facts (ECF No. 62) and an appendix (ECF No. 63).  In addition, they filed a motion to strike Plaintiffs' motion for partial summary judgment (ECF No. 58), along with a brief in support (ECF No. 59).

Motion in Limine

In conjunction with their motion for partial summary judgment, Plaintiffs filed a "motion

in limine" (ECF No. 55) in which they "submit to the Court that they Certify, and can verify, that they have previously attempted to settle this case with the defendants." The Court of Appeals for the Third Circuit has held that: "Unlike a summary judgment motion, which is designed to eliminate a trial in cases where there are no genuine issues of fact, a motion in limine is designed to narrow the evidentiary issues for trial and to eliminate unnecessary trial interruptions." Bradley v. Pittsburgh Bd. of Educ., 913 F.2d 1064, 1069 (3d Cir. 1990) (citation omitted). That purpose is not served by Plaintiffs' motion in limine and it should be dismissed.

Motion to Strike

Defendants move to strike Plaintiffs' motion for partial summary judgment on the grounds that: 1) the motion does not comply with this Court's Local Rules, in that it was not accompanied by a concise statement of material facts or an appendix of record evidence; and 2) certain portions of Plaintiffs' supporting brief contain irrelevant, unfairly prejudicial and speculative material and allegations that are not supported by any admissible evidence. Plaintiffs have not responded to the motion to strike.

Pursuant to Federal Rule of Civil Procedure 12(f), upon a motion by either party, the "court may strike from a pleading ... any redundant, immaterial, impertinent, or scandalous matter." Fed.R.Civ.P. 12(f). The purpose of a Rule 12(f) motion to strike is to "clean up the pleadings, streamline litigation, and avoid the unnecessary forays into immaterial matters." United States v. Educ. Mgmt. Corp., 871 F. Supp. 2d 433, 460 (W.D. Pa. 2012) (McVerry, J.) (citation omitted). The movant must show that the allegations being challenged are so unrelated to the plaintiff's claims as to be unworthy of any consideration and that their presence in the pleadings will be prejudicial. Flanagan v. Wyndham Int'l, Inc., 2003 WL 23198798, at *1 (D.V.I. Apr. 21, 2003) (citing 2 Charles Alan Wright & Arthur R. Miller, Federal Practice and

Procedure, § 1380); <u>River Rd. Dev. Corp. v. Carlson Corp.-Northeast</u>, 1990 WL 69085, at *7 (E.D. Pa. May 23, 1990) (the movant "must clearly show that the matter sought to be stricken is outside the issues in the case and is prejudicial" on a Rule 12(f)(2) motion).

Although courts possess considerable discretion in disposing of a motion to strike under Rule 12(f), <u>Thornton v. UL Enters.</u>, 2010 WL 1005021, at *2 (W.D. Pa. Mar. l6, 2010) (Cohill, J.), "striking a pleading is a 'drastic remedy' to be used sparingly because of the difficulty of deciding a case without a factual record." <u>Dann v. Lincoln Nat. Corp.</u>, 274 F.R.D. 139, 142 (E.D. Pa. 2011); <u>see also</u> <u>Tennis v. Ford Motor Co.</u>, 730 F. Supp. 2d 437, 443 (W.D. Pa. 2010) (McVerry, J.) ("Striking some or all of a pleading is therefore considered a drastic remedy to be resorted to only when required for the purposes of justice.") (citation omitted).

First, "a motion to strike is only applicable to responsive <u>pleadings</u>." <u>Tauro v. Baer</u>, 2009 WL 2410952, at *2 (W.D. Pa. Aug. 4, 2009) (Conti, J.)  Pleadings are defined in Rule 7(a) to include the complaint, answer and third-party complaints and answers, and "thus motions, affidavits, briefs, and other documents outside of the pleadings are not subject to Rule 12(f)." <u>Federal Practice & Procedure</u> § 1380 & n.8.5.  <u>See</u> <u>GRS Dev. Co. v. Jarrett</u>, 2003 WL 21134437, at *3 (V.I. Apr. 10, 2003) (denying motion to strike response to motion for summary judgment on the basis that a motion for summary judgment is not a pleading and neither the motion nor its contends were amenable to being struck from the record).  <u>See also</u> <u>United States v. Coney</u>, 689 F.3d 365, 379 n.5 (5th Cir. 2012) (assuming without deciding that party could file a motion to strike a summary judgment filing).

Second, even assuming that Rule 12(f) could be applied, the failure of Plaintiffs, who are pro se litigants, to comply with Local Rules regarding concise statements of material fact, does not merit the drastic remedy of striking their motion from the record.  <u>See</u> <u>Tyson v. Pitney</u>

<u>Bowes Long-Term Disability Plan</u>, 2009 WL 2488161, at *10 (D.N.J. Aug. 11, 2009). Rather, the rules contemplate that facts which are supported by the record (as those submitted by Defendants are supported) and are not disputed with record citations by the other side (as Plaintiffs have failed to do) may be considered undisputed for purposes of the motion for summary judgment. <u>See</u> Rule 56(e)(2); LCvR 56(E). Moreover, as noted above, the background facts in this case are not substantially disputed and the terms of the Lease are as stated therein.

With respect to Defendants' argument about impertinent material, it appears that they are objecting to two parts of Plaintiffs' brief: one which accuses Defendants (and other third parties) of violating a stay order in Plaintiffs' bankruptcy action and criticizes the means by which certain documents were recorded in the Washington County Recorder of Deeds, and the other of which surmises what John Burig's thoughts and motives might have been in 1961 just before he signed the Lease (ECF No. 54 at 3-6, 8-10). The Court need not strike this material from the record. However, it cannot be considered, as it is not based on personal knowledge. <u>See</u> Fed.R.Civ.P. 56(c)(2) ("A party may object that the cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."); Rule 56(c)(4) (affidavits must be made on personal knowledge). Therefore, Defendants' motion to strike should be denied.

<u>Summary Judgment Standard of Review</u>

As amended effective December 1, 2010, the Federal Rules of Civil Procedure provide that: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322

(1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the non moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Elec. Indus. Corp. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In following this directive, a court must take the facts in the light most favorable to the non-moving party, and must draw all reasonable inferences and resolve all doubts in that party's favor. Hugh v. Butler County Family YMCA, 418 F.3d 265, 266 (3d Cir. 2005); Doe v. County of Centre, Pa., 242 F.3d 437, 446 (3d Cir. 2001).

Plaintiffs argue that judgment should be entered in their favor with respect to Count II of the Complaint because, under Pennsylvania law, payment of a delay rental alone under an oil and gas lease cannot extend the lease beyond its primary term. Thus, they contend that there are no disputed issues of fact and that the oil and production rights created by the 1961 Lease are null and void because no production activity took place for ten years after the Lease was signed (or indeed at any time thereafter).

Defendants respond that the Lease in question is a "dual purpose" lease, which permits both production and storage activities, and contend that it remains in effect so long as the property is used either for the production of gas or for the storage of stored gas or protection of stored gas. Because Plaintiffs have accepted rental payments for the property's use for gas storage since 1961, Defendants contend that the Lease has remained in effect. Defendants argue that Plaintiffs rely upon authorities construing "production only" leases, which are inapposite.

They further contend that: Plaintiffs' position would require that production rights in the Lease be severable from the storage rights, but dual purposes leases have not been found to be severable; there is no implied covenant to produce under a dual purpose lease (and even if there were, there are genuine issues of material fact as to whether Defendants breached such a covenant); Plaintiffs have presented no evidence of abandonment; and the equitable defenses of laches, waiver and estoppel raise facts issues for trial.

Determining State Law

"It is well established that a federal court exercising diversity jurisdiction must apply the substantive law of the appropriate state." Covington v. Continental Tire, Inc., 381 F.3d 216, 218 (3d Cir. 2004). As Pennsylvania is the forum state, Pennsylvania law governs the legal issues presented herein. If the Pennsylvania Supreme Court has not definitively resolved the issue:

> we must consider relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand. The decision of an intermediate state court is particularly relevant and is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.

Id. (citations omitted).

Oil and Gas Leases

The Pennsylvania Supreme Court has held that:

> a lease is in the nature of a contract and is controlled by principles of contract law. J.K. Willison v. Consol. Coal Co., 536 Pa. 49, 54, 637 A.2d 979, 982 (1994). It must be construed in accordance with the terms of the agreement as manifestly expressed, and "[t]he accepted and plain meaning of the language used, rather than the silent intentions of the contracting parties, determines the construction to be given the agreement." Id. (citations omitted). Further, a party seeking to terminate a lease bears the burden of proof. See Jefferson County Gas Co. v. United Natural Gas Co., 247 Pa. 283, 286, 93 A. 340, 341 (1915).

T.W. Phillips Gas and Oil Co. v. Jedlicka, 42 A.3d 261, 267 (Pa. 2012). The court further

explained that:

> Within the oil and gas industry, oil and gas leases generally contain several key provisions, including the granting clause, which initially conveys to the lessee the right to drill for and produce oil or gas from the property; the habendum clause, which is used to fix the ultimate duration of the lease; the royalty clause; and the terms of surrender. <u>Jacobs</u>, 332 F. Supp. 2d at 764 (citing 3 Howard R. Williams & Charles J. Meyers, <u>Oil and Gas Law</u> § 601 (2003)). Further,

> > A habendum clause is used to fix the ultimate duration of an oil and gas lease. 2 Summers, <u>THE LAW OF OIL AND GAS</u> § 281. "The habendum clause of the modern oil and gas lease is the result of a long process of development, in which many influences have aided in shaping its final form," chief of which have been the [distinct] interests of the lessor and lessee, the peculiar needs of the industry and the interpretation and enforcement of certain phrases by the Courts. <u>Id.</u> at § 282 Experimentation in the industry for a suitable durational term progressed from definite term leases, which placed the lessee at a disadvantage if production was only attained late in the term or extended beyond the term, to a definite term with an option to renew, to long term leases with conditional clauses extending the term through the production life of the land. <u>Id.</u> at §§ 283-287.

<u>Id.</u> at 267-68 (quoting <u>Jacobs v. CNG Transmission Corp.</u>, 332 F. Supp. 2d 759, 765 n.1 (W.D. Pa. 2004)).  In <u>T.W. Phillips</u>, the habendum clause provided that the lease would remain in effect for "two years, and as long thereafter as oil or gas is produced in paying quantities…." <u>Id.</u> at 264.  The court held that the phrase "in paying quantities" required consideration of the operator's good faith judgment in maintaining operation of the well and that the lease did produce in paying quantities (and thus did not terminate) when it produced a profit over 80 years except for one year in which the lease sustained a $40 loss 45 years ago.[12]

In this case, however, the Lease's granting clause provides two rights to the lessee: the right to drill, operate and/or produce oil and gas ("production rights") and the exclusive right to

---

[12] Plaintiffs contend that, similarly, at the end of the primary term, there was no well on their property producing gas "in paying quantities."  (ECF No. 54 at 3.)  However, that term does not appear in the Lease.

store any kind of gas on or in the lessor's property ("storage rights"). Lease § 1. In addition, the habendum clause states that the Lease term extends:

> as long thereafter as the above described land or any portion thereof is operated by the Lessee, in search for or in production of oil and gas or as long as such land is utilized by Lessee alone or conjointly with the neighboring lands for either the storage of gas by injection, storage and removal of gas through well or wells operated on either the land herein demised or other adjoining or neighboring lands comprising a part of the same gas storage field, or for the protection of any gas stored in such storage field.

Lease § 2. Defendants contend that this provision means the Lease term can be extended indefinitely so long as the land is being operated by the lessee in the search for or production of oil and gas or used for the storage of gas or the protection of stored gas. They cite a case which held that:

> The use of the disjunctive conjunction "or" in the habendum clause clearly indicates that the term of the lease can be extended by the occurrence of either event: the production of gas or the storage of gas on the property subject to the lease. Moreover, other than the actual storage of gas prior to the expiration of the primary term of the lease (if the lease includes a primary term), no other condition exists as to gas storage in order for the lease term to be extended.

Penneco Pipeline Corp. v. Dominion Transmission, Inc., 2007 WL 1847391, at *13 (W.D. Pa. June 25, 2007), aff'd, 300 F. App'x 186 (3d Cir. Dec. 2, 2008). In Penneco, Judge Ambrose adopted the Report and Recommendation filed by Magistrate Judge Lenihan and found that habendum clauses very similar to the one in the Lease at issue here allowed for the extension of the leases so long as the property was used for the storage of gas. The leases also contained the following language: "It is understood that a well need not be drilled on the premises to permit the storage of gas, and it is agreed that the Lessee shall be the sole judge as to whether gas is being stored within the leased premises and that its determination shall be final and conclusive." Id. at *14. And the leases provided that the lessees would pay a storage rental fee "in lieu of all royalties or rentals otherwise due" and that if the lessee continued to store gas within the leased

premises after all wells were plugged and abandoned, the lessee "must pay a storage rental fee <u>in lieu of all royalty or other sums owed under the lease agreement</u>."  <u>Id.</u>  That is, because the fee was in lieu of royalties, and not in addition thereto, the intent of the parties was that the lessee need not have been engaged in both production and storage activities in order to extend the lease.

The court concluded as follows:

> Looking at the leases in their entirety, their clear and unambiguous language indicates that the lessors (Landowner Plaintiffs' predecessors in title) and lessees (DTI's predecessors) intended that the term of the leases would continue indefinitely as long as the lessees stored gas on the leased premises, despite the absence of any ongoing production/drilling activities. Any other construction of the leases in question is strained and ignores the plain language of the leases. Because the terms of the lease agreements are clear and unambiguous, there is no need to resort to parole evidence to glean the intent of the parties.

<u>Id.</u>  The plaintiffs argued that the leases had expired with respect to production rights, but the court held that production and storage rights were not severable.  <u>Id.</u> at *15-16.  The plaintiffs also argued that there was an implied covenant to produce oil or gas and since the defendants failed to do so they abandoned this right, but the court rejected this argument.  <u>Id.</u> at *17-18.  The court also held that a claim for abandonment requires an intentional relinquishment of rights, not a mere failure to exercise such rights, and there was no evidence of such an intentional relinquishment.  <u>Id.</u> at *19-21.  Finally, the court rejected the plaintiffs' attempt to collaterally estop the defendants from raising the same issues that had been addressed by Judge Cercone in the <u>Jacobs</u> case, holding that, because the defendants had subsequently settled the <u>Jacobs</u> case (which involved only one property, two landowners and one lease, unlike <u>Penneco</u>, which involved over 100 landowners, 48 leases and as many properties), they did not have a full and fair opportunity to litigate the issue of the existence of an implied covenant to produce oil and gas.  The court found <u>Jacobs</u> to be factually distinguishable (because it relied on cases involving "production only" leases) and not persuasive in any event.  <u>Id.</u> at *22-25.  On appeal, the Court

of Appeals stated that it could "add little to the thoughtful analyses set forth in the …

exceptionally thorough and persuasive Report and Recommendation" and affirmed. 300 F.

App'x 186.

Plaintiffs rely heavily on the Pennsylvania Superior Court's decision in <u>Hite v. Falcon</u>

<u>Partners</u>, 13 A.3d 952 (Pa. Super. 2011). In that case, the leases granted "all the oil, gas, surface

and Drilling Rights in, on and under" the plaintiffs' land and the term of each lease stated that:

> 3. Term. Lessee has the right to enter upon the Property to drill for oil and gas at
> any time withinone [sic] (1) year from the date hereof and as long thereafter as oil
> or gas or either of them is produced from the Property, or as operations continue
> for the production of oil or gas, or as Lessee shall continue to pay Lessors two
> ($2.00) dollars per acre as delayed rentals, or until all oil and gas has been
> removed from the Property, whichever shall last occur.

<u>Id.</u> at 944. Immediately after quoting this provision, the court noted that:

> The use of this "term" clause to not only fix the primary term of the lease,
> but also provide for the payment of delay rental, is not typical of modern oil and
> gas leases. <u>Jacobs v. CNG Transmission Corp.</u>, 332 F. Supp. 2d 759, 764-765, fn.
> 1, 766 (W.D. Pa. 2004). Those functions are typically accomplished through the
> use of separate "habendum" and "delay rental" clauses. <u>Id.</u>

<u>Id.</u> n.1. Later in the opinion, the court reiterated that:

> While the form of the leases created to memorialize such agreements has varied,
> the leases at issue in the matter currently before us are unusual. Specifically, the
> language pertaining to the one year primary term and the delay rental due on an
> annual basis, used in conjunction, is not typical, and, as we will explain, requires
> us to affirm the lower court's summary judgment in Plaintiffs' favor.

<u>Id.</u> at 946. Specifically, the court held that delay rentals function to relieve the lessee of the

obligation to develop the leasehold during the primary term of the lease. Because the lessee had

not developed the leasehold during the primary term, the mere payment of delay rentals alone

would not preserve the lessee's drilling rights indefinitely.

Defendants herein contend that <u>Hite</u> involved a production only lease. However, it is not

clear whether this is the case, because the granting clause is not fully quoted in the opinion.

19

Nevertheless, what is clear is that the term clause—which the court took pains to note was atypical—did not refer to gas storage or protection. Therefore, the <u>Hite</u> decision never addressed what effect gas storage and payments made for such storage would have on extending the lease.

Ultimately, this Court need not determine whether the result that obtained in <u>Penneco</u> is compelled is this case, because Defendants have not moved for summary judgment in their favor. Rather, the only issue presented is whether Plaintiffs have demonstrated that summary judgment should be entered in their favor based on the <u>Hite</u> case. Because the habendum clause in the Lease differs significantly from the unusual term clause at issue in <u>Hite</u>, and because it closely resembles the habendum clauses at issue in <u>Penneco</u>, it cannot be said that Plaintiffs have met their summary judgment burden. Moreover, as Defendants note, in this case (unlike in <u>Hite</u>), the evidence supports the conclusion that Columbia Gas is not solely paying delay rentals in an effort to preserve indefinitely the right to engage in gas production. Rather, Columbia Gas is paying a storage rental fee as compensation for utilizing the leased premises for an express purpose of the Lease, namely the use of the property for the storage of gas or the protection of stored gas.

<u>Severance of Production and Storage Rights</u>

Furthermore, Defendants contend, the only way in which Plaintiffs could demonstrate that the production rights under the Lease have terminated is if the Lease were to be severed such that gas storage rights were made separate from gas production rights. But they argue that, as the authorities cited above (<u>Penneco</u>, <u>Jacobs</u>) indicate, gas leases with both production and storage rights have not typically been found to be severable based upon their leasing, habendum and payment clauses.

Defendants cite by contrast a case in which production and storage rights were found to

be severable, <u>Rook v. James E. Russell Petroleum</u>, 679 P.2d 158 (Kan. 1984).  But that case: 1) is not binding on this Court as it arises under Kansas law; 2) was distinguished by the court in <u>Penneco</u> because the leases in <u>Rook</u> contained an assignment clause providing evidence of an attempt to treat the different interests under the leases separately and the compensation was separately stated for production rights versus storage rentals, 2007 WL 1847391, at *18-19 & n.46;  3) is further distinguishable because Kansas law recognizes an implied covenant to develop and operate absent express provisions rejecting such an implication, but Pennsylvania law recognizes such an implied covenant "where the only compensation to the landowner contemplated in the lease is royalty payments resulting from the extraction of that underground resource," <u>Jacobs v. CNG Transmission Corp.</u>, 772 A.2d 445, 455 (Pa. 2001), but royalty payments for the extraction of gas are not the only form of payment recognized by the Lease; 4) is distinguishable because the plaintiffs in <u>Hite</u> refused to continue accepting the delay rental payments, 13 A.3d at 949 n.8, but Plaintiffs herein have not; and 5) is further distinguishable because the plaintiffs in <u>Hite</u> invoked a Right of Renewal clause to see if the lessee would match the offers they were receiving from other gas companies but the lessee did not respond, but here there is no such clause in the Lease.

Defendants are correct that many of the factors identified in the <u>Rook</u> case are not present here: Kansas law appears to have a different standard for recognizing an implied covenant to produce, Plaintiffs have not refused any payment and compensation under the Lease does not separate gas production from gas storage.  As the court indicated in <u>Penneco</u>, dual purpose leases in general appear incompatible with the notion of severability.

On the other hand, Defendants have omitted the fact that the Lease contained an assignment clause, which allowed the lessee to separately assign its drilling and production rights

while retaining the gas storage rights. Lease § 6. In fact, in 2005, Columbia Gas subleased to Range Resources any gas production rights it had in the Donegal Storage Field, including any gas production rights that may have existed under the Lease. In 2007, Plaintiffs and Range Resources entered into a new lease for the oil and gas under Plaintiffs' land for the purposes of drilling, operating for, producing, removing and marketing oil, gas and coalbed methane gas for a period of three years. It is noted that the 2007 lease states that "Lessor hereby excepts and reserves from this lease agreement any existing storage, unplugged, abandoned, and/or non commercially producing wells located on the leased premises." (Compl. Ex. C ¶ 26.) And in 2009, Columbia Gas conveyed the gas production rights to NEVCO. But "Columbia Gas has retained, and continues to retain, the storage rights." (Maddox Decl. ¶ 8.)

The assignment clause in the Lease and the history of separate assignments constitute evidence which could support a finding that the production rights are severable from the storage rights under the Lease. Defendants have not addressed the assignment clause or these recent events, nor have they explained why, if the parties treated the gas production and storage rights as severable for purposes of assignment, Plaintiffs are precluded from arguing that accepting payments for gas storage extends the Lease only with respect to gas storage and not with respect to gas production as well. Moreover, Defendants have has not explained why, if Range Resources and its predecessors in interest held the gas production rights pursuant to the 1961 Lease, it entered into a new lease with Plaintiffs in 2007 to drill for gas. Did that 2007 lease supersede the 1961 Lease? And when it terminated without any wells being drilled in 2010, what became of the gas production rights?

Again, however, the Court need not conclusively answer these questions or determine as a matter of law that production rights and storage rights under the Lease were not severable

(which would be Defendants' position). Rather, the only question presented is whether they have pointed to genuine issues of material fact such that it cannot be said that the rights were severable. For all of the reasons cited above, they have pointed to such evidence and it cannot be determined on this record whether the rights were severable or not.

Implied Covenant to Produce

Plaintiffs suggest that Defendants failed to comply with the Lease's implied covenant to produce oil or gas. As noted above, Pennsylvania law does recognize such an implied covenant but only "where the only compensation to the landowner contemplated in the lease is royalty payments resulting from the extraction of that underground resource," Jacobs v. CNG Transmission Corp., 772 A.2d 445, 455 (Pa. 2001). The Lease in this case had other forms of compensation.

Moreover, as Defendants note, even if an implied covenant to produce were read into the Lease, there would still remain issues of material fact as to whether Columbia Gas, NEVCO and Range Resources in fact breached such a covenant. Some courts have required evidence of fraud to demonstrate breach of an implied covenant to produce. See AG Servs., Inc. v. T.W. Phillips Gas & Oil Co., 1994 WL 762150, at *15 (W.D. Pa. Jan. 19, 1994). Others have applied the test of "a reasonably prudent operator under the same or similar facts and circumstances." Amoco Prods. Co. v. Alexander, 622 S.W.2d 563, 567-68 (Tex. 1981).

Plaintiffs have pointed to no evidence of fraud. Even applying the less stringent "reasonably prudent operator" standard, Defendants have submitted evidence that they did act prudently in considering whether drilling through the storage field would endanger the driller or the integrity of the field, and whether technological developments and economic conditions have only recently made drilling through the storage field feasible. (Maddox Decl. ¶¶ 32, 34-50.)

Plaintiffs have submitted no evidence to the contrary. Thus, there would be genuine issues of material fact as to whether Defendants acted as reasonably prudent operators in not drilling a well even if the Lease contained an implied covenant to do so.

Abandonment

Defendants argue that, to the extent Plaintiffs are suggesting that they abandoned any production rights that existed under the Lease by failing to engage in gas production within the primary term, there is no basis for finding abandonment.

To find abandonment, Pennsylvania law requires "a party [to] show an intentional relinquishment of rights; a mere failure to exercise such rights, however, does not constitute abandonment." Penneco, 2007 WL 1847391, at *19 (citing Girolami v. Peoples Natural Gas Co., 76 A.2d 375, 378 (Pa. 1950)). Plaintiffs have pointed to no evidence of an intentional relinquishment and the mere fact that gas production did not occur does not allow the Court to presume an intent to abandon production rights. Id. at *21.

Laches, Waiver and Estoppel

Lastly, Defendants contend that Plaintiffs' declaratory judgment claim is barred by the doctrines of laches, waiver and estoppel. However, they have not fully developed these arguments. For example, to invoke the doctrine of laches, Defendants would have to demonstrate that Plaintiffs inexcusably delayed in filing suit, but as the record indicates, the parties have been negotiating with one another in recent years (signing a new gas production lease in 2007) and thus it cannot be said on this record that Plaintiffs "slept on their rights." In any event, the Court need not address these affirmative defenses. See Penneco, 2007 WL 1847391, at *25 (not reaching affirmative defenses of statute of limitations, laches and failure to provide notice and opportunity to cure).

For these reasons, it is recommended that the motion for partial summary judgment filed on behalf of the plaintiffs, Rugh A. Mason and Sherry L. Mason (ECF No. 53), be denied. It is further recommended that the motion in limine filed by the plaintiffs (ECF No. 55) be dismissed. It is further recommended that the joint motion to strike plaintiffs' motion for partial summary judgment, filed on behalf of the defendants, Range Resources-Appalachia, LLC and NiSource Energy Ventures, LLC (ECF No. 58), be denied.

Litigants who seek to challenge this Report and Recommendation must seek review by the district judge by filing objections by March 12, 2014. Any party opposing the objections shall file a response by March 26, 2014. Failure to file timely objections will waive the right of appeal.

Respectfully submitted,

s/Robert C. Mitchell_____
ROBERT C. MITCHELL
United States Magistrate Judge

Dated: February 26, 2014