# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Rugh A. Mason and Sherry L. Mason,<br><br>Plaintiffs,<br><br>v.<br><br>Range Resources-Appalachia LLC and NiSource Energy Ventures LLC,<br><br>Defendants. | Civil Action No. 12-369 |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

CONTI, Chief Judge

## I. Introduction

Plaintiffs Rugh A. Mason and Sherry L. Mason (collectively the "Masons" or "plaintiffs") seek a declaration that they own the oil and gas production rights associated with their property in Washington County, Pennsylvania.[1] In 1961, prior owners of the Masons' property leased the oil and gas rights to that property. The Masons assert that the 1961 lease expired before they acquired the property or, alternatively, a novation extinguished the 1961 lease. Defendants Range Resources-Appalachia LLC ("Range Resources") and NiSource Energy Ventures LLC ("NiSource" and together with Range Resources, "defendants") assert that the lease from 1961 remains valid and controls the oil and gas rights associated with the Masons' property. Defendants also raise the affirmative defenses of latches, waiver, and estoppel.

This matter is before the court following a bench trial held November 13, November 14, and December 2, 2014. The Masons (ECF No. 174) and defendants

---

1 The declaratory judgment action is count 2 of the Masons' complaint and was bifurcated from count 1, a claim for tortious interference with contract against defendant Range Resources-Appalachia LLC. Count 1 was tried to a jury in June 2014 and resulted in a defense verdict.

(ECF No. 175) filed proposed findings of fact and conclusions of law. The court considered the evidence adduced at trial, the written submissions of the parties, and the applicable law. Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the court makes the following findings of fact and conclusions of law:

## II.    Findings of Fact

### A.  The Parties

FOF 1.    The Masons are husband and wife, and they own a 151-acre property in Washington County, Pennsylvania, on which they reside. (Joint Stipulations of Fact ¶ 1, ECF No. 96 [hereinafter "JSF"].)

FOF 2.    Range Resources is a limited liability company whose members are Range Resources-Pine Mountain Inc. and Range Production Co., which are both Delaware corporations with principal places of business in Texas. Prior to a name change in 2007, Range Resources was known as Great Lakes Energy Partners LLC. (Pls.' Proposed Findings of Fact ¶ 2, ECF No. 174; Defs.' Proposed Findings of Fact ¶¶ 3–4, ECF No. 175.)

FOF 3.    NiSource is a Delaware limited liability company whose sole member is Columbia Energy Group, a Delaware corporation with a principal place of business in Columbus, Ohio. (Defs.' Proposed Findings of Fact ¶ 2, ECF No. 175.)

### B.  History of Natural Gas Development in Western Pennsylvania

FOF 4.    Natural gas production began in western Pennsylvania and surrounding states in the Appalachian Basin in the late 1890s. (Maddox Test. 4:56–68, Ex. D21, ECF No. 143.)

FOF 5.    The gas-producing formations exploited by this early development were relatively shallow and contained reasonably small amounts of gas. (Kramer Test. 4:96–98, Ex. D20, ECF No. 142.)

FOF 6.   The demand for natural gas increased greatly between 1910 and 1920, and production from gas fields in the Appalachian Basin declined as those fields were depleted. (Maddox Test. 4:71–73, Ex. D21, ECF No. 143.)

FOF 7.   After the depletion of the shallow gas fields, natural gas development in the Appalachian Basin fell to very low levels until around 2002, when increasing gas prices spurred renewed drilling. (*Id.* at 13:308–319.)

FOF 8.   Deep shale formations in the Appalachian Basin such as the Marcellus Shale and Utica Shale contain natural gas, but oil and gas producers did not consider production from these formations to be economically viable until the early 2000s, when rising gas prices and enhanced horizontal drilling and hydraulic fracturing techniques made production feasible.[2] (*Id.* at 20:483–97.)

FOF 9.   The first Marcellus Shale well was drilled in Washington County in 2003, and production from that well began in 2005. (*Id.* at 20:498–99.)

### C. *Natural Gas Storage Fields*

FOF 10.   To meet the demand for natural gas in the Midwest and Northeast during winter, gas companies use natural gas storage fields. Natural gas storage fields are commonly created from the same geologic formations from which gas was extracted. Once a natural gas formation is depleted, a storage field operator injects gas into the formation during warm months when demand is low. The gas is pumped back out when demand is high. (*Id.* at 5:82–106.)

---

2    The horizontal drilling technique permits a producer to drill down to a thin seam of coal or shale, turn the drill ninety degrees, and drill along the seam. Hydraulic fracturing is a process in which a high-pressure fluid, usually water mixed with lubricating chemicals and a proppant such as sand or ceramic balls, is pumped into the well. The fluid fractures the rock and the proppant permits oil and gas to flow through the fissures. The combination of these techniques, first perfected in about 1998, opened up previously inaccessible reserves of oil and gas in relatively impermeable shale formations. *See* Thomas W. Merrill, *Four Questions About Fracking*, 63 Case W. Res. L. Rev. 971, 972–73 (2013).

FOF 11.   The portion of a gas storage field that holds the gas is known as the storage reservoir. A storage reservoir must be sufficiently porous and permeable to hold the injected gas and allow it to flow. It should also have an impermeable rock "cap" and low or no permeability around the edges to prevent the gas from escaping upward or to the side. In short, a storage reservoir "acts like a giant underground container." (*Id.* at 6:108–127.)

FOF 12.   Due to the inability to know the exact location or extent of various rock formations deep underground, the boundary of the storage reservoir cannot be precisely determined. Because of the uncertainty over the actual extent of the stored gas, the operator designates a protective area or buffer area around the predicted storage reservoir area. The protective area insures that the storage reservoir will not be inadvertently breached by drilling activity in the surrounding area. The protective area is an integral component of a natural gas storage field. (*Id.* at 8:186–9:193.)

FOF 13.   Natural gas storage fields in Pennsylvania must comply with Pennsylvania regulations and regulations adopted by the Federal Energy Regulatory Commission ("FERC"). A storage field owner must obtain a certificate of public convenience and necessity from FERC authorizing operation of a storage field. The certificate application includes a map of the boundaries of the storage reservoir and the protective area. The storage field boundary represents a "best assessment of where the storage field contains stored gas." (*Id.* at 7:154–9:193)

FOF 14.   The FERC-issued certificate of public convenience and necessity permits operators to exercise the right of eminent domain to obtain rights-of-way, easements, or property necessary for storage. (Trial Tr. 41:7–23, Nov. 14, 2014, ECF No. 167.)

FOF 15.   It is possible to drill through a natural gas storage field to reach gas contained in deeper formations, but drilling though a storage field involves risks to safety and the integrity of the storage field and adds additional technical challenges

and expenses to the drilling. (Maddox Test. 13:301–14:335, Ex. D21, ECF No. 143.)

FOF 16. Pennsylvania imposes strict requirements on wells drilled through storage fields. (*Id.* at 15:349–353.)

FOF 17. Columbia Gas Transmission LLC ("Columbia"), not a party to this action, is an interstate natural gas pipeline company. Columbia owns and operates thirty-seven natural gas storage fields in New York, Pennsylvania, Ohio, and West Virginia, including the Donegal Storage Field. (JSF ¶ 3, ECF No. 96; Maddox Test. 7:136–140, Ex. D21, ECF No. 143.)

FOF 18. The Donegal Storage Field is located under approximately 11,000 acres of land in Washington County, Pennsylvania. (JSF ¶ 3, ECF No. 96.)

FOF 19. FERC issued a certificate of public convenience and necessity to Columbia for the Donegal Storage Field. (Trial Tr. 38:19–40:6, Nov. 14, 2014, ECF No. 167; Order Issuing Certificate, 64 FERC ¶ 62176, 1993 WL 343820 (Sept. 13, 1993), Ex. D7.)

FOF 20. Columbia's certificate of public convenience and necessity covers the area within the boundary of the storage reservoir and the protective area, and permits Columbia to continue operating the Donegal Storage Field. (Trial Tr. 40:15–19, Nov. 14, 2014, ECF No. 167; Order Issuing Certificate, 64 FERC ¶ 62176, 1993 WL 343820 (Sept. 13, 1993), Ex. D7.)

FOF 21. Columbia's predecessor, the Manufacturers Light and Heat Company, began operating the Donegal Storage Field in 1940. (JSF ¶ 3, ECF No. 96.)

FOF 22. With the development of storage fields, it became relatively common for oil and gas leases in the Appalachian Basin to be "dual purpose" leases permitting production or storage of gas. (Kramer Test. 3:79–4:106, Ex. D20, ECF No. 142.)

FOF 23.   The Manufacturers Light and Heat Company entered into leases or easements with landowners permitting it to use the subsurface for the storage reservoir and protective area of the Donegal Storage Field. (Maddox Test. 10:214–231, Ex. D21, ECF No. 143.)

FOF 24.   The Masons' property is located over the eastern edge of the Donegal Storage Field. Approximately two-thirds of the Masons' property is in the storage field protective area. Approximately one-third of their property is outside of the storage field area. No part of their property is over the storage field reservoir. (*Id.* at 11:243–258; Joint Ex. 17.)

### D.  Historical Ownership of the Masons' Property

FOF 25.   In 1984, Sherry Mason, then known as Sherry Roth, and her former husband purchased the 151-acre property from Jacqueline Walker. (Joint Ex. 13; Trial Tr. 18:16–22, 100:9–101:23, Nov. 13, 2014, ECF No. 169.)

FOF 26.   Rugh Mason moved to the property in 2000. The Masons were married in 2001. (*Id.* at 18:1–2, 65:22–23.)

FOF 27.   Jacqueline Walker acquired the property from the estate of John A. Burig in 1973. (Joint Ex. 14.)

FOF 28.   John A. Burig, Flora W. Burig, and Anna C. Burig (collectively the "Burigs") owned 165 acres. The Masons' 151-acre property is a portion of the land previously owned by the Burigs. (JSF ¶ 8, ECF No. 96.)

FOF 29.   In 1961, the Burigs entered into an oil and gas lease (the "1961 lease") with the Manufacturers Light and Heat Company for their 165-acre property. (*Id.* ¶ 6.)

FOF 30.   Columbia is the successor in interest to the Manufacturers Light and Heat Company's rights as lessee under the 1961 lease. (Compl. ¶ 39, ECF No. 1-2.)

### E.  The 1961 Lease

FOF 31.   The 1961 lease is a three-page preprinted form with blanks that are filled by typed or handwritten terms. (Ex. D9.)

FOF 32. The lease is dated March 22, 1961, and is between John A. Burig, Flora W. Burig, and Anna C. Burig and the Manufacturers Light and Heat Company. (*Id.*)

FOF 33. The leasing or granting clause states:

> 1. LEASING CLAUSE  The Lessor in consideration of One Dollar ($1.00) paid by the Lessee, the receipt of which is hereby acknowledged, does hereby grant, demise and lease unto the Lessee all the oil and gas, in and underlying all that certain parcel of land situate in Donegal Township, Washington County, and State of Pennsylvania as hereinafter described, with the exclusive right in the Lessee to enter upon said land to explore and drill for, produce and market all such oil and gas thereunder, to utilize such land and the underlying strata or sands, including the oil and gas formations, for injecting, storing and withdrawing gas of any kind, regardless of the source thereof, and for protecting the gas stored therein as well as under adjoining and neighboring lands; said parcel … [c]ontaining 165 acres, more or less, and being the same property secured from William C. Burig. No new well to be drilled, however, within two hundred feet of the dwelling house or barn now on the premises without the consent of Lessor.

> The Lessor further grants Lessee during the term of this lease the exclusive right to enter upon the above described land to drill, maintain and operate new wells and to recondition, reopen, operate and maintain all existing and abandoned wells located thereon for the production of oil and gas and for the storage of gas, by injecting, storing, and withdrawing the same by pumping or otherwise through such wells or other wells located on adjoining or neighboring lands in the same vicinity; the rights of way and servitudes on, over, and through such tract for pipelines, drips, tanks, meters and regulators, together with the structures to house the same; the right to use oil, gas and water from said land free of cost to the Lessee for all such purposes; the right of ingress and egress over such tract for exercising any of the aforesaid rights, and all other rights and privileges necessary, incident to, or convenient for the operation of the above described tract, alone and conjointly with other lands for the production and transportation of oil and gas, and for the injection, storage and withdrawal of gas,

with the right of removing either during or after the term
hereof all machinery, pipe lines and other equipment placed
on said land by the Lessee, including the right to draw and
remove casing. The Lessee will pay Lessor for any damages
caused to growing crops, trees and fences on the demised
premises caused by Lessee's operations hereunder.

(*Id.* § 1.)

FOF 34.   The terms or habendum clause states:

2. TERMS  The parties hereto agree that this lease shall remain
in force for the term of ten (10) years from April 1, 1961, and
as long thereafter as the above described land or any portion
thereof is operated by the Lessee, in search for or in
production of oil or gas or as long as such land is utilized by
Lessee alone or conjointly with neighboring lands for either
the storage of gas by injection, storage and removal of gas
through well or wells operated on either the land herein
demised or other adjoining or neighboring lands comprising a
part of the same gas storage field, or for the protection of any
gas stored in such storage field. The parties hereto agree that
the Lessee shall be the sole judge as to whether such land is
being used for any of the aforesaid gas storage purposes,
including protection of stored gas, and Lessee's determination
thereof shall be final and conclusive.

(*Id.* § 2.)

FOF 35.   The payment or royalty clause states:

3. PAYMENT TO LESSOR  A. Royalties—The Lessee cove-
nants and agrees in consideration of the premises: (a) to
deliver to the credit of the Lessor, free of cost, in the pipeline to
which Lessee may connect its wells, a royalty of the equal one-
eighth (⅛) part of all oil produced and saved from the above
described land; and (b) to pay the Lessor an annual production
or storage well royalty of Three Hundred Dollars ($300.00) per
year for each well drilled, reconditioned or reopened upon said
premises and thereafter operated by Lessee to produce gas in
paying quantities as a gas production well or utilized by Lessee
for a gas storage well as hereinbefore provided; such annual gas
production or storage royalty to be paid Lessor quarterly in
advance, beginning as of the date of such utilization and

continuing thereafter until any such well is either plugged or abandoned or this lease terminated.

B. Rentals—The Lessee covenants and agrees to pay, and the Lessor covenants and agrees to accept an annual acreage rental of One Hundred Sixty Five and 00/100 Dollars ($165), payable quarterly in advance, beginning April 1, 1961, until a well is completed and operated by Lessee on the above described land for either the production of gas or oil, or storage of gas as hereinbefore provided, or this lease surrendered; any rental paid for time beyond the date of utilization of such gas well for either the production or storage of gas shall be credited to the first royalty due upon the same. It is agreed that the said Lessee shall be the sole judge as to whether to drill or not drill on said land, and the consideration and rentals paid and agreed to be paid hereunder constitute adequate compensation for such privilege. In the event that Lessee is not paying royalty upon any other well on the leased premises at the time any new or existing well is abandoned for any reason before being utilized by the Lessee for any of purposes named herein or in the event the Lessee should later abandon and cease to use all the wells previously utilized by Lessee on the property for any of the aforesaid purposes, Lessee may continue to hold all its production and storage rights granted hereunder by continuing either to make the said acreage rental payments as provided herein or by resuming the payment of such acreage rental payments on this lease in lieu of such royalty payment within three (3) months from the time Lessee has ceased to operate the last well on this lease for any of the aforesaid gas production or storage purposes.

C. Manner of Payment . . . .

(*Id.* § 3.)

FOF 36.   The "free gas" section of the lease provides:

4. FREE GAS   If gas is either being produced, marketed from or is available in sufficient quantity from any well or wells located on the said premises, the Lessor excepts and reserves from the premises herein demised, gas in a total amount not to exceed 150,000 cubic feet per year free of cost, for heat and light in one dwelling house on the premises, which amount of gas Lessor may receive by laying the necessary lines and making connections at Lessor's cost at such point on the

demised premises as may be designated by the Lessee, provided said gas is used with economical appliances and is measured by meter furnished by Lessee as in the case of other consumers. . . .

(*Id.* § 4.)

FOF 37. The lease provides that either party may assign its "entire interest or estate" in the lease "or any part thereof." (*Id.* § 6.)

### F.  Events Subsequent to the 1961 Lease

#### 1.  Course of Dealing

FOF 38. No well was drilled on the property subject to the 1961 lease during the ten-year primary term of the 1961 lease or afterward. (Trial Tr. 64:3–65:1, Nov. 13, 2014, ECF No. 169.)

FOF 39. The Masons' property was used for the protection of gas stored in the Donegal Storage Field during the ten-year primary term of the 1961 lease and has been continually used for the protection of stored gas since that time. (JSF ¶ 4, ECF No. 96.)

FOF 40. Since 1985, Sherry Mason has received rental payments under the 1961 lease from Columbia. The payment checks state that they are for payment of a "storage land rental due party or parties under combination (oil, gas, storage) lease described for the period stated." The checks identify the lessor as John A. Burig et al. (Trial Tr. 115:8–17, Nov. 13, 2014, ECF No. 169; Ex. D1.)

#### 2.  Columbia Subleases and Assigns Rights

FOF 41. In 2005, Columbia subleased its oil and gas production rights in leases covering the Donegal Storage Field to Great Lakes Energy Partners LLC, a predecessor to Range Resources. This sublease included Columbia's oil and gas production rights to the Masons' property under the 1961 lease. (Maddox Test. 20:502–04, Ex. D21, ECF No. 143.)

FOF 42. The oil and gas leases that Columbia had with landowners in the Donegal Storage Field area were primarily entered into in the late 1950s and early 1960s. (Trial Tr. 68:1–25, Dec. 2, 2014, ECF No. 170.)

FOF 43. These older leases were not compatible with modern horizontal drilling techniques. Modern wells can extend horizontally several thousand feet and cross multiple property lines. In order to permit drilling under multiple properties at once, leases must contain "pooling" and "unitization" clauses. (Trial Tr. 24:2–25, Dec. 2, 2014, ECF No. 170.)

FOF 44. In 2009, Columbia assigned its rights as sublessor under the sublease with Range Resources to NiSource. (Maddox Test. 20:504–05, Ex. D21, ECF No. 143.)

### 3. *The Masons Seek to Lease the Oil and Gas Production Rights Associated with Their Land*

FOF 45. In the early 2000s, landmen representing oil and gas producers began approaching the Masons to see if the Masons would be interested in leasing their oil and gas rights. (Trial Tr. 20:18–25, Nov. 13, 2014, ECF No. 169.)

FOF 46. The Masons consulted with an attorney, who advised them to obtain a copy of the 1961 lease. (*Id.* at 22:5–8.)

FOF 47. The Masons did not enter into any agreements in the early 2000s because they felt the compensation being offered was insufficient. (*Id.* at 22:9–15.)

FOF 48. In 2007, the Masons learned that Range Resources (then Great Lakes Energy Partners LLC) was in the early stages of acquiring oil and gas leases in western Pennsylvania for deep-well production. (*Id.* at 25:5–7.)

FOF 49. The Masons contacted Range Resources and were put in touch with Dave Szuhay ("Szuhay"), a landman who was acquiring oil and gas leases for Range Resources in western Pennsylvania. (*Id.* at 25:8–20.)

FOF 50. In 2007, oil and gas producers, including Range Resources, were rushing to sign leases in western Pennsylvania. The process was "chaotic" and "like the Wild West," with landmen from Range Resources trying to secure as much acreage as possible. (Trial Tr. 25:9–18, Dec. 2, 2014, ECF No. 170.)

FOF 51. After entering into the 2005 sublease with Columbia, Range Resources tried to determine how to unitize the older leases covering the Donegal Storage Field to make them compatible with modern drilling techniques. (*Id.* at 24:23–25.)

FOF 52. Szuhay and other landmen working for Range Resources were not sure whether the leases they were acquiring in the Donegal Storage Field area were legal. They would take the leases and "let the attorneys worry about it later." (*Id.* at 25:1–8.)

FOF 53. Range Resources did not have a through process for checking the validity of leases, and some properties were leased multiple times. (*Id.* at 26:2–10.)

FOF 54. The Masons met with Szuhay and signed a lease (the "2007 lease") with Range Resources dated March 23, 2007. The lease was for a term of three years "and so much longer thereafter as oil, gas, and/or coalbed methane gas or their constituents are produced or are capable of being produced on the premises in paying quantities . . . ." (Ex. P1, § 2.) The Masons received a signing bonus of $12,080 and the lease provided for a royalty of 14.5% of the market price for oil, gas, or coalbed methane produced. (*Id.* § 4.)

FOF 55. The lease stated that "Lessor hereby warrants that Lessor is not currently receiving any bonus, rental, production royalty as the result of any prior oil and gas lease covering any or all of the subject premises . . . ." (*Id.* § 20.)

FOF 56. Rugh Mason did not read the lease thoroughly or take it to an attorney because Sherry Mason and he wanted the money. (Trial Tr. 72:6–18, Nov. 13, 2014, ECF No. 169.)

FOF 57.  Rugh Mason and Szuhay gave conflicting testimony about whether they discussed the 1961 lease during the negotiations over the 2007 lease.

(a)  Rugh Mason testified that Szuhay did not mention anything about the 1961 lease, the Masons not owning the oil and gas rights associated with their land, or their land being used for storage or protection of gas stored in the Donegal Storage Field during their discussions prior to signing the 2007 lease. (*Id.* at 30:12–31:24.)

(b)  Rugh Mason did not mention the 1961 lease to Szuhay because he did not consider it to be relevant to the 2007 lease. (*Id.* at 70:8–14.)

(c)  Szuhay testified that he told the Masons their property was in a storage field and the Masons acknowledged that it was. Szuhay explained, very generally, that their property was subject to an existing lease that did not permit horizontal wells and the 2007 lease would supplement the original lease. (Trial Tr. 27:22–28:6, 34:17–25, Dec. 2, 2014, ECF No. 170.)

(d)  The court need not determine which account of the negotiations is accurate. Any discussion of the 1961 lease at the meeting between the Masons and Szuhay, if it occurred, was in very general terms and not significant.

FOF 58.  There is no evidence that Szuhay or anyone acting on behalf of Range Resources intentionally misrepresented the validity of the 2007 lease to the Masons.

FOF 59.  Range Resources did not drill a well on the Masons' property during the three-year primary term of the 2007 lease, and that lease expired on March 23, 2010. (Trial Tr. 38:9–22, Nov. 13, 2014, ECF No. 169.)

FOF 60.  Before the expiration of the of the 2007 lease, the Masons entered into negotiations with Range Resources to sign a new lease. (*Id.* at 39:2–40:21.)

FOF 61.   The Masons signed what they believed to be a new lease with a landman in November 2009, but Range Resources declined to accept the lease. (*Id.* at 46:24–47:9.)

FOF 62.   After the expiration of the 2007 lease, the Masons tried to secure a lease with other oil and gas companies, but they were unsuccessful. The Masons were told that the 1961 lease was a cloud on their title. (*Id.* at 49:19–51:2.)

### G. Prior Lease Agreements

FOF 63.   In 1906, W.C. Burig and Kate Burig (the parents of John A. Burig) entered into two oil and gas leases with the Manufacturers Light and Heat Company (the "1906 leases"). The two parcels, one of 140 acres and one of 25 acres, constituted the same 165 acres covered by the 1961 lease. (Exs. D14, D15; Trial Tr. 75:3–21, Dec. 2, 2014, ECF No. 170.)

FOF 64.   A well was drilled under the terms of the 1906 leases. The well was productive for a total of four and a half years, and it was abandoned in 1912. (Trial Tr. 75:22–76:15, 79:14–17 Dec. 2, 2014, ECF No. 170.)

FOF 65.   In 1923, W.C. Burig and Kate Burig entered into an oil and gas lease (the "1923 lease") for their 165 acres with H.O. Campsey, one of their neighbors. This lease had a primary term of twenty years. (Ex. D11; Trial Tr. 76:16–25, Dec. 2, 2014, ECF No. 170.)

FOF 66.   H.O. Campsey assigned the 1923 lease to the Natural Gas Company of West Virginia, a predecessor of Columbia. (Ex. D12; Trial Tr. 77:1–9, Dec. 2, 2014, ECF No. 170.)

FOF 67.   In 1931, W.C. Burig and the Natural Gas Company of West Virginia agreed to modify the 1923 lease by reducing the amount of delay rental payments from $247.52 per year to $165.00 per year. The Natural Gas Company of West Virginia indicated it would surrender the lease if the modification was not accepted, and W.C. Burig agreed to the lower rental payment in order for the 1923 lease to continue. (Ex. D13; Trial Tr. 77:10–17, Dec. 2, 2014, ECF No. 170.)

FOF 68. In 1951, John A. Burig, Flora W. Burig, and Anna C. Burig entered into a lease with the Manufacturers Light and Heat Company (the "1951 lease"). This lease granted the Manufacturers Light and Heat Company the right to drill for oil and gas and store "Gas of any kind." The 1951 lease had a primary term of ten years "and as much longer as" oil and gas production operations continued on the premises. (Ex. D10; Trial Tr. 77:18–78:2, Dec. 2, 2014, ECF No. 170.)

FOF 69. Unlike the 1961 lease, the 1951 lease did not provide for the continuation of the lease for as long as the property is used for the storage of gas or the protection of stored gas. (Ex. D10.)

FOF 70. No well was drilled during the ten-year primary term of the 1951 lease, and the lease terminated in 1961. (Ex. D10; Trial Tr. 78:9–11, Dec. 2, 2014, ECF No. 170.)

### H. Expert Testimony

FOF 71. The parties presented expert testimony about the customs and practices of the oil and gas industry with respect to oil and gas leases.

FOF 72. The Masons' expert is Alfred Lander ("Lander"), a Pennsylvania lawyer with over thirty-six years of experience in real estate and property law. Lander has represented landowners and oil and gas companies and certified over 5,000 title opinions. (Lander Test. 2:2–13, Ex. P8, ECF No. 139.)

FOF 73. Bruce M. Kramer ("Kramer"), the expert for NiSource, is an emeritus professor of law at Texas Tech University School of Law and co-author of *Williams & Meyers Oil and Gas Law*, a well-respected treatise, among other works. (Kramer Test. 1:2–2:31, Ex. D20, ECF No. 142.)

FOF 74. Timothy Maddox ("Maddox"), another expert for NiSource, is a petroleum geologist and petroleum engineer and the manager of reservoir services for Columbia. (Maddox Test. 2:1–14, Ex. D21, ECF No. 143.)

### 1. Opinions of Lander

FOF 75.  Lander opined that the Masons currently own the oil and natural gas rights associated with their property. (Lander Test. 3:29–33, Ex. P8, ECF No. 139.)

FOF 76.  Lander opined that the 1961 lease terminated after its ten-year primary term because neither the Manufacturers Light and Heat Company nor Columbia used the Burigs' property to drill a well or store gas during that term. (*Id.* at 4:60–5:75.)

FOF 77.  Lander concluded that the use of the land solely for the protection of stored gas was insufficient to permit the lease to continue into the secondary term. (*Id.* at 5:75–81.)

FOF 78.  In Lander's opinion, the Masons' property is not used for the storage of gas and cannot be considered part of the Donegal Storage Field, although it is in a "buffer zone or protective area" for the Donegal Storage Field. (*Id.* at 7:101–108.)

FOF 79.  Lander concluded that the term "storage field" in the habendum clause of the 1961 lease does not include the Donegal Storage Field because the lease did not mention the Donegal Storage Field by name. (*Id.* at 7:109–8:117.)

FOF 80.  Based upon custom and practice in the industry, Lander opined that the primary purpose of the 1961 lease for the Manufacturers Light and Heat Company was the production of gas, not storage. Lander opined that the fact that the Burigs' property was close to the Donegal Storage Field was advantageous because any production wells could be connected to the storage field for easy market access. (*Id.* at 12:199–13:214.)

FOF 81.  According to Lander, the most important part of a lease such as the 1961 lease from the perspective of landowners similarly situated to the Burigs was the free gas clause. (*Id.* at 13:215–15:248.)

FOF 82. Lander opined that if a gas producer's leasing agents told landowners similarly situated to the Burigs that no wells would be drilled, they would receive no free gas, and the lease could be extended indefinitely for $1 per acre, "it would have been the practice and the custom of the landowner to have become enraged; the landowner would have abruptly terminated negotiations." (*Id.* at 16:266–68.) The landowner would inform neighbors about the company's actions and the company would have difficulty negotiating leases with other landowners in the area. (*Id.* at 15:258–16:276.)

FOF 83. With respect to the 2005 agreement between Columbia and Range Resources, Lander opined that the agreement is an assignment rather than a sublease. It therefore created privity of estate between Range Resources and the Masons and terminated privity of contract for oil and gas production rights between Columbia and the Masons. (*Id.* at 9:137–144.)

FOF 84. Lander concluded that the 2005 agreement was a novation of Columbia's oil and gas production rights in the Mason's property. (*Id.* at 9:148–151.)

FOF 85. Lander opined that when the 2007 lease between Range Resources and the Masons terminated in 2010, all oil and gas rights reverted to the Masons in fee simple. (*Id.* at 11:183–12:193.)

    2. *Opinions of Kramer*

FOF 86. Kramer testified about the customs and practices of the oil and gas industry with respect to leasing.

FOF 87. Kramer opined that a "dual purpose" oil and gas lease contains language that allows the lease to continue into the secondary term if the lessee engaged in either production or storage operations. (Kramer Test. 3:79–4:85, Ex. D20, ECF No. 142.)

FOF 88. Kramer opined that the 1961 lease has many of the characteristics of a typical "dual purpose" lease. (*Id.* at 8:190–198.)

FOF 89. The terms in the lease that describe the activities permitting the lease to extend into the secondary term are called "limitations." For example, a typical dual purpose lease might have two limitations: production operations and storage operations. (*Id.* at 6:147–7:167.)

FOF 90. Kramer opined that the 1961 lease has four "limitations": (1) searching for oil and gas, (2) producing oil and gas, (3) storing oil and gas, or (4) protecting underground storage of gas. (*Id.* at 8:199–212.)

FOF 91. Kramer opined that the 2005 sublease between Columbia and Range did not alter the terms of the 1961 lease because the unilateral action of one party cannot amend the original agreement between the parties. (*Id.* at 11:284–289.)

FOF 92. Kramer stated that the 2007 lease between the Masons and Range Resources was ineffective because under the 1961 lease the Masons only owned a possibility of reverter with respect to their oil and gas rights. (*Id.* at 12:305–13:320.) The 2007 lease did not alter the 1961 lease. (*Id.* at 13:336–342.)

### 3. *Opinions of Maddox*

FOF 93. Maddox testified about the history of natural gas development in western Pennsylvania and particularly about natural gas storage fields. (Maddox Test. 4:54–21:508, Ex. D21, ECF No. 143; *see supra* sections II.B, II.C.)

FOF 94. Due to the technical challenges inherent in drilling through a gas storage field, Maddox opined that Columbia, NiSource, and Range Resources acted as "reasonably prudent operators" by not seeking to produce natural gas from formations below the Donegal Storage Field until 2005. (Maddox Test. 21:513–22:541, Ex. D21, ECF No. 143.)

FOF 95. Maddox rebutted some of the opinions given by Lander. (Trial Tr. 61:1–3, Dec. 2, 2014, ECF No. 170.)

(a) Maddox did not agree with Lander's conclusion that the Masons' property is not part of the Donegal Storage Field. The Masons' property is within

the area described in the FERC certificate, and the storage field protective area is an integral part of the storage field. (*Id.* at 61:12–63:7.)

(b) It is not customary in the industry for a lease to refer to a specific storage field by name. (*Id.* at 63:14–25.)

(c) Gas extracted from a production well must be processed to remove any impurities and to insure that the heating content is within the appropriate range before it can be pumped into a storage reservoir. The treated gas is routed to a central measurement and compressor site before being stored. Connecting a production well directly to a storage facility is not advantageous. (*Id.* at 69:8–71:12.)

(d) Maddox disagreed with Lander's assessment that from the lessor's perspective the most important term in the 1961 lease was the free gas clause. The free gas clause provided a maximum of 150,000 cubic feet of gas per year. The retail cost of natural gas in 1961 was approximately thirty cents per thousand cubic feet. Under the free gas clause of the 1961 lease, the lessor could expect to receive a maximum of $45 of free gas per year, much less than the $165 annual acreage rental or $300 annual royalty per well drilled. (*Id.* at 72:3–73:9.)

### 4. *Evaluation of Expert Testimony*

FOF 96. After considering Lander's expert testimony in light of the other evidence before the court, the court finds that his testimony should be given little weight. Specifically, the court finds that the evidence does not support Lander's conclusions about the advantage of siting production wells on the Burigs' property near the Donegal Storage Field and the importance of the free gas clause to lessors in the Burigs' position.

FOF 97. The court finds, contrary to Lander's opinion testimony, that the area designated on FERC maps as the Donegal Storage Field protective area, including a portion of the Masons' property, is part of the Donegal Storage Field. (Maddox Test.

8:186–9:194, Ex. D21, ECF No. 143; Trial Tr. 61:12–63:7, Dec. 2, 2014, ECF No. 170; Joint Ex. 17; Order Issuing Certificate, 64 FERC ¶ 62176, 1993 WL 343820 (Sept. 13, 1993), Ex. D7. *But see* Trial Tr. 40:2–41:5, Nov. 14, 2014, ECF No. 167.)

FOF 98. Maddox's testimony is creditable and entitled to weight.

FOF 99. The testimony of Kramer about the customs and practices of the oil and gas industry with respect to leasing is creditable and helpful.

FOF 100. The opinions of Lander and Kramer about the current ownership of the oil and gas production rights associated with the Masons' property, whether the 1961 lease terminated, whether the 2005 lease was a novation of the 1961 lease, and the effect of the 2007 lease are conclusions about legal questions that must be decided by the court. No weight is given to these opinions.

## III.   Conclusions of Law

### A.   Jurisdiction, Venue, and Remedy

COL 1. The court has jurisdiction over this matter under 28 U.S.C. § 1332 because the plaintiffs and defendants are citizens of different states and the amount in controversy exceeds $75,000.

COL 2. Venue is proper because a "substantial part of the events or omissions giving rise to the claim occurred" in this district. 28 U.S.C. § 1391(b)(2).

COL 3. Plaintiffs seek a declaration that they are the sole owners of the oil and gas production rights associated with their land. The court has authority to issue a declaratory judgment under 28 U.S.C. § 2201.

COL 4. Plaintiffs did not seek a declaration with respect to the storage rights associated with their property. The storage rights remain with Columbia under the 1961 lease, and the court's declaration is limited to the sole issue of the production rights. Nothing in these findings of fact and conclusions of law is binding on

Columbia or constitutes res judicata or collateral estoppel with respect to Columbia, which is not a party to this action.

### B. Applicable Law

COL 5.  The parties agree that Pennsylvania law governs this dispute. (Pls.' Proposed Conclusions of Law ¶ 3, ECF No. 174; Defs.' Proposed Conclusions of Law ¶ 3, ECF No. 175.)

COL 6.  In applying Pennsylvania law, the court must follow the decisions of the Pennsylvania Supreme Court. *Spence v. ESAB Grp., Inc.*, 623 F.3d 212, 216 (3d Cir. 2010). If the Pennsylvania Supreme Court has not addressed an issue, the court must predict how it would rule. *Id.* This prediction is guided by "'decisions of state intermediate appellate courts, of federal courts interpreting that state's law, and of other state supreme courts that have addressed the issue,'" and the court may also consider "'analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand.'" *Id.* at 216–17 (quoting *Norfolk S. Ry. Co. v. Basell USA Inc.*, 512 F.3d 86, 92 (3d Cir. 2008)).

### C. Interpretation of the 1961 Lease

#### 1. General Principles of Contract Interpretation

COL 7.  Under Pennsylvania law, general principles of contract law apply when interpreting an oil and gas lease. *T.W. Phillips Gas & Oil Co. v. Jedlicka*, 42 A.3d 261, 267 (Pa. 2012).

COL 8.  "'The fundamental rule in contract interpretation is to ascertain the intent of the contracting parties.'" *Lesko v. Frankford Hosp.-Bucks Cnty.*, 15 A.3d 337, 342 (Pa. 2011) (quoting *Ins. Adjustment Bureau, Inc. v. Allstate Ins. Co.*, 905 A.2d 462, 468 (Pa. 2006)). "'[W]hen a written contract is clear and unequivocal, its meaning must be determined by its contents alone.'" *Id.* (quoting *Steuart v. McChesney*, 444 A.2d 659, 661 (Pa. 1982)). "If left undefined, the words of a contract are to be given their ordinary meaning." *Kripp v. Kripp*, 849 A.2d 1159, 1163 (Pa. 2004).

COL 9.    "A contract is ambiguous if it is reasonably susceptible of different construc-
tions and capable of being understood in more than one sense." *Id.* An
ambiguity may be "patent, created by the language of the instrument, or latent,
created by extrinsic or collateral circumstances." *Id.* Whether a contract is
ambiguous is a question of law. *Hutchinson v. Sunbeam Coal Corp.*, 519 A.2d
385, 390 (Pa. 1986).

COL 10.    If a contract is ambiguous, extrinsic evidence is admissible to resolve the
ambiguity. *Id.* The trier of fact resolves conflicting parol evidence to determine
the intent of the parties. *Id.*

COL 11.    Under Pennsylvania law generally, ambiguity in a written oil and gas lease is
construed in favor of the lessor and against the lessee. *Jacobs v. CNG
Transmission Corp.*, 332 F. Supp. 2d 759, 773–74 & n.6 (W.D. Pa. 2004);
*Pomposini v. T.W. Phillips Gas & Oil Co.*, 580 A.2d 776, 778 (Pa. Super. Ct.
1990). The construe-against-the-lessee rule applies only when examination of
the parol evidence fails to clarify the ambiguity. *Jacobs*, 322 F. Supp. 2d at 774;
*see In re Aurora Oil & Gas Corp.*, 460 B.R. 470, 481 (Bankr. W.D. Mich. 2011)
(interpreting Michigan law and concluding that construing an ambiguity in
favor of the lessor does not mean that "'lessor always wins' or 'other contract
interpretation principles need not apply.'"); 1 Patrick H. Martin & Bruce
M. Kramer, Williams & Meyers Oil and Gas Law § 301 n.1 (2014)
[hereinafter "Williams & Meyers"] ("The *Aurora* court made the correct
observation that the 'construe against the lessee' canon of construction is not
the equivalent of the 'lessee always loses' canon.").

### 2.    *Features of Oil and Gas Leases*

COL 12.    Oil and gas leases have some common features "universally recognized within
the field." *Jacobs*, 322 F. Supp. 2d at 764. These include the "granting clause,"
the "habendum clause," the "royalty clause," and the terms of surrender. *Id.*

COL 13.  A granting clause generally conveys to the lessee the right to use the property to drill for and produce oil and gas, and in the case of a "dual purpose" lease also conveys the right to use the property for the storage of gas. *See id.* at 765.

COL 14.  In an oil and gas lease, the habendum clause defines "how long the interest granted to the lessee will extend." *Habendum clause*, Black's Law Dictionary (10th ed. 2014). In "virtually all contemporary leases," the habendum clause provides for a defined primary term (typically one to ten years) and provides that the lease may continue into an indefinite secondary term "'so long thereafter' as oil or gas (or other specified minerals) is produced in paying quantities." 3 Williams & Meyers § 601.4.

COL 15.  A habendum clause may permit a lease to continue into the secondary term based upon activities other than production of oil or gas in paying quantities. A clause that keeps the lease alive into the secondary term is known as a "savings clause." *Smith v. Steckman Ridge, LP*, 38 F. Supp. 3d 644, 652 (W.D. Pa.), *aff'd* 590 F. App'x 189 (3d Cir. 2014); 8 Williams & Meyers 946.

COL 16.  In the Appalachian Basin, it is common for oil and gas leases to contain a savings clause that permits storage of non-native gas to extend the lease into the secondary term. 3 Williams & Meyers § 603.3(f); *see Penneco Pipeline Corp. v. Dominion Transmission, Inc.*, Civil Nos. 05-49, 05-537, 2007 WL 1847391, at *13 (W.D. Pa. June 25, 2007), *aff'd* 300 F. App'x 186 (3d Cir. 2008); *Jacobs*, 332 F. Supp. 2d at 765.

COL 17.  Oil and gas leases may contain a variety of provisions providing compensation to the lessor. Payments to lessors may include, among other things, royalties, delay rentals, and storage rentals.

COL 18.  Royalties are payments to the lessor typically in form of a percentage of the market value of oil and gas produced from the property. 3 Williams & Meyers § 641.

COL 19.    A delay rental is a payment to the lessor to maintain the lease during the primary term if the lessee has not commenced operations on the property. *Id.* § 605. The purpose of a delay rental is to relieve the lessee from the duty of immediately developing the property, which was an implied requirement in early oil and gas leases. *See Jacobs*, 332 F. Supp. 2d at 766 n.3; *Hite v. Falcon Partners*, 13 A.3d 942, 946–47 (Pa. Super. Ct. 2011).

COL 20.    The payment of delay rentals alone is insufficient to extend a lease beyond the primary term. *Smith*, 38 F. Supp. 3d at 657; *Hite*, 13 A.3d at 948.

COL 21.    If a property is the subject of a "dual purpose" lease that allows for production and storage, use of the property for storage and payment of storage rentals is sufficient to extend the lease beyond the primary term. *Penneco*, 2007 WL 1847391, at *14.

### 3.  *Plaintiffs' Interpretation of the 1961 Lease*

COL 22.    Plaintiffs argue that the granting clause of the 1961 lease "is unambiguous to the extent that the lessor grants the lessee the right to use the Masons' Land to produce gas, store gas and protect gas stored *on the leased premises*, a condition precedent to the use of the leased premises for the benefit of storing gas or protecting stored gas on neighboring or adjoining lands." (Pls.' Proposed Conclusions of Law ¶ 13, ECF No. 174.)

COL 23.    Plaintiffs assert that nothing in the lease can reasonably be construed as permitting the Masons' property to be used for the protection of gas stored on adjoining lands "without the lessor first achieving the bargain of production and storage royalties." (*Id.*)

COL 24.    Plaintiffs argue that the habendum clause "is unambiguous to the extent that the lessor grants to the lessee the right to enter upon the land and to use the Masons' Land to explore for gas, produce gas, store gas and protect gas stored *on the leased premises* . . . ." (*Id.* ¶ 20.)

COL 25.    Plaintiffs argue that the "sole judge" provision in the habendum clause
           indicates that "the contemplated 'storage field' had yet to be developed, while the
           Donegal Storage Field had been in existence for decades." (*Id.*) The
           contemplated storage field "would only be developed through the process of
           depleting the Masons' Land of its native gas, and subsequently using the
           depleted reservoir for storage of gas . . . ." (*Id.*)

COL 26.    Plaintiffs assert that the parties to the 1961 lease did not contemplate the
           protection of gas stored in the Donegal Storage Field because the Donegal
           Storage Field is not mentioned by name in the lease, although it had existed for
           more than twenty years in 1961. (*Id.*)

COL 27.    Plaintiffs argue that the annual payments of $1 per acre are delay rental
           payments, which are insufficient to extend the lease into the secondary term.
           (*Id.* ¶ 26.)

COL 28.    Plaintiffs argue that the 1961 lease "contains no provision for the payment of
           protection of storage on either the Masons' Land or neighboring lands in either
           the primary or secondary terms [sic]" and therefore fails for lack of
           consideration. (*Id.* ¶ 29.)

### 4. Defendants' Interpretation of the 1961 Lease

COL 29.    Defendants argue that the 1961 lease is unambiguous. They assert that the lease
           continued into the secondary term due to the property being used for the
           storage of gas and the protection of stored gas, and the lease may continue
           indefinitely as long as the property continues to be used for storage or the
           protection of storage and the storage rentals are paid. (Defs.' Proposed
           Conclusions of Law ¶¶ 21–46, ECF No. 175.)

COL 30.    Defendants argue that the rental payments under the lease served a dual
           purpose—delay rental payments during the primary term and storage rental
           payments during the secondary term. (*Id.* ¶ 52.)

COL 31. Defendants assert that the parties' course of conduct after the 1961 lease, including the payment of storage rentals by Columbia and the acceptance of those rentals by the Masons for thirty years, demonstrates that they considered the lease to continue to be valid. (*Id.* ¶¶ 58–63.)

COL 32. Defendants argue that the production and storage rights under the 1961 lease are not severable. (*Id.* ¶¶ 64–87.)

### 5. *Effect of Admissions in the Complaint*

COL 33. The complaint in this case contained the following assertions of fact:

(a) "The Masons' Land is located above an underground gas storage area and buffer zone that is known as the Donegal Storage Field." (Compl. ¶ 6, ECF No. 1-2.)

(b) "At all relevant times, Columbia Gas has stored gas in the Donegal Storage Field … under the gas leases that form the Donegal Storage Field, including the 1961 Lease." (*Id.* ¶ 9.)

(c) "At all relevant times, Columbia Gas has used the Masons' Land for the storage of gas or for the protection of stored gas pursuant to the 1961 Lease." (*Id.* ¶ 10.)

(d) "Columbia Gas … continues to operate the Masons' Land and the rest of the Donegal Storage Field for storing natural gas." (*Id.* ¶ 39.)

COL 34. On November 11, 2014, two days before the start of the trial in this case, plaintiffs moved for leave to file an amended complaint to change paragraphs 6, 9, 10, and 39, which they contended were not supported by the facts and evidence. (ECF No. 152.)

COL 35. Because of the extreme lateness of the request and the prejudice it would cause defendants in terms of needing to prove facts that had been admitted, the court denied the motion. (Trial Tr. 13:21–15:1, 16:15–20, Nov. 13, 2014, ECF No. 169.)

COL 36. Plaintiffs argue that they should not be bound by the allegations in paragraphs 6, 9, 10, and 39 of the complaint because they "apparently did not fully appreciate that their honest belief as to their land's relationship to an entity know to them as the Donegal Storage Field would constitute binding legal conclusions as to the validity of the 1961 Lease." (Pls. Proposed Conclusions of Law ¶ 33, ECF No. 174.) Plaintiffs argue that judicial admissions may be "'disregarded in the interests of justice.'" (*Id.* ¶ 32 (quoting *The Doyle*, 105 F2d 113, 117 (3d Cir. 1939)).) Plaintiffs assert that the evidence of record demonstrates that the Masons' property is in part above the Donegal Storage Field protective area and not at all above the gas storage reservoir. (*Id.* ¶ 33.) Finding otherwise based solely on the allegations in the complaint would be "contrary to the interests of justice," according to plaintiffs. (*Id.*)

COL 37. Facts expressly conceded in a complaint are binding on the plaintiff. *Sovereign Bank v. BJ's Wholesale Club, Inc.*, 533 F.3d 162, 181 (3d Cir. 2008) ("[T]he allegation in the amended complaint is a binding judicial admission."); *Parilla v. IAP Worldwide Servs., VI, Inc.*, 368 F.3d 269, 275 (3d Cir. 2004) ("'Judicial admissions are formal concessions in the pleadings, or stipulations by the party or its counsel, that are binding upon the party making them.'" (quoting *Keller v. United States*, 58 F.3d 1194, 1198 n.8 (7th Cir. 1995)). Judicial admissions are confined to "matters of fact which otherwise would require evidentiary proof," and a statement of fact must be unequivocal to be a binding judicial admission. *Glick v. White Motor Co.*, 458 F.2d 1287, 1291 (3d Cir. 1972).

COL 38. The assertions in paragraphs 6, 9, 10, and 39 of the complaint are clear and unequivocal statements of fact that would otherwise require evidentiary proof. The assertions are judicial admissions binding on the plaintiffs.

COL 39. Holding plaintiffs to the assertions they made in the complaint is not contrary to the interests of justice. Plaintiffs acknowledge that their property is in the Donegal Storage Field protective area and used for the protection of gas stored in the Donegal Storage Field. (JSF ¶ 4, ECF No. 96; Pls.' Proposed Findings of

Fact ¶ 25, ECF No. 174.) The court found that the storage field protective area is part of the Donegal Storage Field. *See supra* Findings of Fact ¶ 97. Whether natural gas is being currently stored under the Masons' property does not affect the outcome of the court's interpretation of the 1961 lease. Even if the Masons' property is only used for the protection of gas stored in the Donegal Storage Field, the court concludes that the 1961 lease is still valid, as set forth below.

### 6. Conclusions About the 1961 Lease

#### (a) Use of the Property for Protection of Stored Gas Extended the Lease into the Secondary Term

COL 40. After considering the parties' proposed interpretations of the 1961 lease, the court concludes that the 1961 lease is unambiguous with respect to whether use of the property for protection of gas stored on adjacent lands permits the lease to extend into the secondary term.

COL 41. The habendum clause provides that the lease extends into the secondary term for "as long thereafter as" the property is operated

> [1] in search for *or* [2] in production of oil or gas *or* [3] as long as such land is utilized by Lessee alone or conjointly with neighboring lands for either the storage of gas by injection, storage and removal of gas through well or wells operated on either the land herein demised or other adjoining or neighboring lands comprising a part of the same gas storage field, ***or*** **[4] for the protection of any gas stored in such storage field.**

(Ex. D9, § 2 (emphases added).)

COL 42. Use of the disjunctive conjunction "or" indicates that the term of the lease extends into the secondary term when the lessee operates the property for any of the four listed purposes. *See Penneco*, 2007 WL 1847391, at *13.

COL 43. The *Penneco* case involved many leases. The habendum clauses in the majority of those leases provided that the term of the lease could be extended by either the production of gas or the storage of gas on the property subject to the lease. *Id.* The court held that use of the leased properties for storage of gas and

payment of storage rentals extended the leases into the secondary term. *Id.* at *14.

COL 44.   Leases with savings clauses permitting the protection of stored gas to extend the lease into the secondary term appear to be relatively common. The court identified a number of decisions involving leases with such clauses. *See Henry v. Chesapeake Appalachia, L.L.C.*, 739 F.3d 909, 910 (6th Cir. 2014); *Stewart v. SWEPI, LP,* 918 F. Supp. 2d 333, 337 (M.D. Pa. 2013); *Roe v. Chief Exploration & Dev. LLC*, Civil Nos. 11-816, 11-697, 11-579, 2013 WL 4083326, at *1 (M.D. Pa. Aug. 13, 2013); *Linder v. SWEPI LP,* Civil No. 11-1579, 2013 WL 521898, at *5 (M.D. Pa. Feb. 11, 2013); *Aukema v. Chesapeake Appalachia, LLC*, 904 F. Supp. 2d 199, 204 (N.D.N.Y. 2012); *Roman v. Chesapeake Appalachia, L.L.C.*, Civil No. 11-1614, 2012 WL 2076846, at *1 (M.D. Pa. June 8, 2012). None of these decisions, however, addressed whether such a savings clause is valid— that is, whether protection of stored gas alone can extend a lease beyond the primary term. The court is not aware of any such decision.

COL 45.   The rationale in *Penneco* is persuasive. The court is aware of no principled reason why a savings clause permitting the lease to continue for the protection of stored gas should be treated differently from a savings clause permitting the lease to continue for storage of gas. Use of the leased premises for protection of storage, like use for storage, does not require a well to be drilled and would not entitle the lessor to production or per well royalties. In both cases the only payment would be the annual acreage rental.

COL 46.   Plaintiffs argue that the habendum clause in the 1961 lease permits the lease to extend into the secondary term for protection of storage only when the gas being protected is stored on the leased premises, but this argument is unpersuasive.

COL 47.   The protection-of-storage savings clause applies to "any gas" stored "on either the land herein demised or other adjoining or neighboring lands comprising a part of the same gas storage field." (Ex. D9, § 2.)

COL 48.   The Masons' property was used as part of the Donegal Storage Field for the protection of stored gas during the ten-year primary term of the 1961 lease and has been continually used for the protection of stored gas since that time. (JSF ¶ 4, ECF No. 96.)

COL 49.   Because of that activity, the lease continued into the secondary term and did not terminate in 1971.

COL 50.   This conclusion is further supported by the granting clause, which grants the right to utilize the land "for protecting the gas stored therein as well as under adjoining and neighboring lands." (Ex D9, § 1.)

COL 51.   Plaintiffs argue that according to custom and practice in the oil and gas industry, use of the phrase "as well as" in the granting clause means that the lessor may not use the leased premises to protect gas stored under adjoining and neighboring lands unless the lessor is also protecting gas stored under the leased premises. (Pls.' Proposed Findings of Fact ¶ 77, ECF No. 174; Trial Tr. 75:12–24, Nov. 14, 2015, ECF No. 167.)

COL 52.   The structure of the sentence does not support this interpretation. Except for the testimony of Lander, to which the court accords only little weight, there is no evidence of any custom and practice in the oil and gas industry to interpret "as well as" in this manner.

COL 53.   The ordinary meaning of "as well as" in this context is "[t]o the same extent, in the same degree, as much, as," and it is "[u]sed to denote the inclusion of one thing (person, etc.) or class with another." 20 Oxford English Dictionary 117–18 (2d ed. 1989).[3]

---

3    The *Oxford English Dictionary* provides two other definitions of "as well as," neither of which are applicable in this context: "[i]n as good, efficient, satisfactory, (etc.) a way or manner as" and "[w]ith weakened force, passing into the sense of 'both . . and,' 'not only . . but also.'" 20 Oxford English Dictionary 117–18 (2d ed. 1989).

COL 54. There is no significant discussion of the legal meaning of the phrase "as well as" in the literature reviewed by the court. The meaning of the word "and," however, has generated substantial commentary. Bryan A. Garner, A Dictionary of Modern Legal Usage 624 (2d ed. 1995).

> Authorities agree that *and* has a several sense as well as a joint sense, and that *or* has an inclusive sense as well as an exclusive sense. Hence:
>
> • The "several *and*": A and B, jointly or severally.
>
> • The "joint *and*": A and B, jointly but not severally.
>
> • The "inclusive *or*": A or B, or both.
>
> • The "exclusive *or*": A or B, but not both.
>
> …
>
> "The meaning of *and* is usually *several* . . . . The meaning of *or* is usually inclusive."

*Id.* (quoting Scott J. Burnham, The Contracting Drafting Guidebook 163 (1992)).

COL 55. When the word "and" is used in a permissive sentence, it is likely to be used in its several sense. Maurice B. Kirk, *Legal Drafting: The Ambiguity of "And" and "Or,"* 2 Tex. Tech L. Rev. 235, 243 (1971).

> "Stating the matter broadly, we can say that in a permissive sentence the inclusive 'or' is interchangeable with the several 'and.' Again, this does not say that 'and' means 'or.' It says that in such a context the two words are reciprocally related: the implied meaning of one is the same as the express meaning of the other."

*Id.* (quoting F. Reed Dickerson, The Fundamentals of Legal Drafting 84 (1st ed. 1965)).

COL 56. Like the word "and," the phrase "as well as" has a several sense. *See, e.g.*, *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2234 (2015) (Alito, J., concurring) ("[Government entities] may put up all manner of signs to promote safety, as well as

directional signs and signs pointing out historic sites and scenic spots."); *Killian v. United States*, 368 U.S. 231, 246 n.5 (1961) ("'Membership or lack of membership in the Communist Party may be established by direct as well as circumstantial evidence.'" (quoting the trial court's jury instructions)).

COL 57.   The granting clause of the 1961 lease is a permissible sentence that gives the lessee certain rights.

COL 58.   The only reasonable construction of the granting clause is that the lessee may use the land for protecting gas stored immediately under the land or gas stored under adjoining land or both (A or B or both). There is no support for plaintiff's construction (A or both), and the joint construction (both only) is nonsensical.

### (b) The Lease Does Not Fail for Lack of Consideration

COL 59.   The "Rentals" clause (section 3.B) of the 1961 lease provides for an annual acreage rental payment of $165 "until a well is completed and operated by Lessee … for either the production of gas or oil, or storage of gas as hereinbefore provided, or this lease surrendered; any rental paid for time beyond the date of utilization of such gas well for either the production or storage of gas shall be credited to the first royalty due upon the same." (Ex. D9, § 3.)

COL 60.   Plaintiffs argue that this "annual acreage rental payment" is a delay rental payment. Defendants argue it is a storage rental payment.

COL 61.   Lease agreements in some other cases have specific provisions dealing with storage rental payment separate from delay rental payments. One such provision is found in the lease in *Jacobs*, and it provided that

> "[i]n full compensation for the storage rights herein granted and in lieu of all delay rentals or royalty due or to become due for the right to produce or for the production of oil or gas from the Sands, Strata, or Horizons where gas may be stored as herein provided, lessee covenants and agrees to pay lessor when no wells on the leased premises are utilized for the storage of gas, an annual storage rental of one hundred twenty

32

> ($120.00) dollars, at a rate of one ($1.00) dollars, per acre, per
> annum, payable quarterly in advance . . . ."

*Jacobs*, 332 F. Supp. 2d at 767 (quoting lease).

COL 62.   In *Penneco*, the leases generally contained a delay rental clause and "either a separate provision for Payment for Storage Privileges or similar wording contained in … the Royalties clause." 2007 WL 1847391, at *7. The payment for storage privileges clauses provided for an annual storage rental "in lieu of all delay rental or royalty due." *Id.* The storage rental payments were generally either a fixed fee or a per acre fee. *Id.* In one version of the leases in *Penneco*, the payment for storage provision "states that the amount due for storage rental shall be equal to the amount due under the delay rentals clause." *Id.* at *14 n.40.

COL 63.   Unlike the leases in *Jacobs* and *Penneco*, the 1961 lease does not contain separate delay rental and storage rental provisions.

COL 64.   After considering the contractual language and the parties' interpretations of this clause, the court concludes that the 1961 lease is reasonably susceptible to different interpretations with respect to whether the annual acreage rental is a delay rental payment, storage or protection-of-storage rental payment, or combination of the two. The court will consider extrinsic evidence to resolve this ambiguity.

COL 65.   The Burigs had a history of leasing their oil and gas mineral rights for more than fifty years before the 1961 lease. W.C. Burig and Kate Burig, the parents of John A. Burig, first entered into oil and gas leases with the Manufacturers Light and Heat Company in 1906. (Exs. D14, D15.)

COL 66.   The Burigs continued to lease their oil and gas rights long after the well drilled on the Burigs' land stopped producing and was abandoned in 1912. W.C Burig and Kate Burig entered into a twenty-year lease in 1923. (Ex. D11.) The Burigs received delay rental payments under this lease, and in 1931 the Burigs agreed

to accept a lower rental payment when the lessor offered to surrender and cancel the lease. (Ex. D13.)

COL 67. The lease immediately preceding the 1961 lease was the 1951 lease between John A. Burig, Flora W. Burig, and Anna C. Burig and the Manufacturers Light and Heat Company. This lease had a ten-year term that could only be extended by oil and gas production activities and not, unlike the 1961 lease, storage or the protection of storage. The lease had a $165 annual acreage rental, which it specifically identified as a "rental for delay." (Ex. D10.)

COL 68. The 1961 lease does not call the annual acreage rental a "rental for delay." (Ex. D9.)

COL 69. The Manufacturers Light and Heat Company (and later Columbia) continued to pay the acreage rental amount after the end of the primary term of the 1961 lease. Sherry Mason has received and accepted the annual acreage rental payments for thirty years.

COL 70. The evidence of the parties' conduct before entering into the 1961 lease and after the expiration of the primary term of the 1961 lease demonstrates that the parties intended the annual acreage rental payment in the 1961 lease to be a payment for storage or the protection of storage or both. The contract does not fail for a lack of consideration.

### D. Novation

COL 71. Plaintiffs argue that the 2005 agreement between Columbia and Range Resources was an assignment, not a sublease. By reason of the assignment, Columbia no longer had any interest in the oil and gas production rights in the Masons' property. Plaintiffs assert that the 2007 lease between Range Resources and the Masons was a novation of the 1961 lease. They argue that when the 2007 lease expired, the oil and gas production rights for the Masons' property reverted to the Masons. (Pls.' Proposed Conclusions of Law ¶ 39, ECF No. 174.)

COL 72. Under Pennsylvania law, the elements of a novation are (1) the displacement and extinction of a prior contract, (2) the substitution of a valid new contract for the prior contract, (3) sufficient legal consideration for the new contract, and (4) the consent of the parties. *Yoder v. T.F. Scholes, Inc.*, 173 A.2d 120, 121–22 (Pa. 1961); *First Lehigh Bank v. Haviland Grille, Inc.*, 704 A.2d 135, 138 (Pa. Super. Ct. 1997). "[W]hether a contract has the effect of a novation primarily depends upon the parties' intent." *First Lehigh Bank*, 704 A.2d at 138. The party claiming the existence of a novation "bears the burden of demonstrating the parties had a 'meeting of the minds.'" *Id.* at 138–39. Evidence of the parties' intent to enter into a novation "may be shown by other writings, or by words, or by conduct or by all three." *Buttonwood Farms, Inc. v. Carson*, 478 A.2d 484, 487 (Pa. Super. Ct. 1984).

COL 73. Even if the court assumes that 2005 agreement between Columbia and Range Resources severed the production rights from the storage rights, there is no evidence that the Masons or Range Resources intended to extinguish the 1961 lease and replace it with the 2007 lease.

COL 74. Rugh Mason testified that neither Szuhay nor he mentioned or discussed the 1961 lease while they negotiated the 2007 lease. (Trial Tr. 31:13–17, Nov. 13, 2014, ECF No. 169.) Rugh Mason felt that the 1961 lease "wasn't relevant" to the 2007 lease. (*Id.* at 70:8–14.) Szuhay testified that he discussed the 1961 lease with the Masons, but only in very general terms. (Trial Tr. 34:17–25, Dec. 2, 2014, ECF No. 170.) The 2007 lease did not mention the 1961 lease or the 2005 sublease. (Ex. P1.)

COL 75. During the term of the 2007 lease, Sherry Mason continued to accept the annual acreage rental payments made under the 1961 lease.

COL 76. Plaintiffs acknowledge that "Columbia and Range may not have meant to create a novation through their deal," but they nonetheless argue that the actions of Columbia and Range "did in fact result in a novation of the 1961

Lease." (Pls.' Proposed Conclusions of Law ¶ 39, ECF No. 174.) Pennsylvania law does not support this conclusion because the intent of the parties is the primary basis for determining whether a contract is a novation. *First Lehigh Bank*, 704 A.2d at 138. Plaintiffs failed to meet their burden to prove a novation existed. The 2007 lease was not a novation of the 1961 lease because there is no evidence that the parties to the 2007 lease intended to extinguish and replace 1961 lease.

COL 77. Plaintiffs contend that Range Resources and Columbia "misrepresent[ed] the validity of the new leases, such as the 2007 Lease." (Pls.' Proposed Findings of Fact ¶ 135, ECF No. 174; *see* Pls.' Proposed Conclusions of Law ¶ 39, ECF No. 174.) Range Resources and NiSource moved to strike those portions of plaintiffs' proposed findings of fact and conclusions of law concerning intentional misrepresentations by Range Resources or Columbia (ECF No. 176). Because the court did not find that Range Resources or Columbia intentionally misrepresented the validity of leases, the motion to strike will be denied as moot.

### E. *Affirmative Defenses*

COL 78. Because the court finds in favor of defendants with respect to the interpretation of the contracts at issue in this case, the court need not address the affirmative defenses of laches, waiver, and estoppel.

## IV. Conclusion

For the reasons set forth above, the court concludes that the 1961 lease is still in effect and the Masons are not entitled to judgment declaring them the sole owners of the oil and gas production rights associated with their land. The court will enter judgment in favor of defendants NiSource and Range Resources and against plaintiffs Rugh A. Mason and Sherry L. Mason. The court's judgment will follow.

Dated: July 27, 2015      /s/ Joy Flowers Conti
                                      Joy Flowers Conti
                                      Chief United States District Judge